IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| HORTER INVESTMENT | : | Case No. 1:15-cv-00477 |
| MANAGEMENT, LLC, | : | |
| | : | Judge Susan J. Dlott |
| Plaintiff, | : | |
| | : | |
| v. | : | **Order Regarding Defendants' Motions** |
| | : | **for Summary Judgment** |
| JEFFREY CUTTER, *et al.*, | : | |
| | : | |
| Defendants. | : | |

This matter is before the Court on the Motion for Summary Judgment by Defendant

Jeffrey Cutter (Doc. 71) and the Motion for Summary Judgment by Defendants Ryan Borer and

PCM Advisory LLC ("PCM") (together, "Borer/PCM"). (Doc. 72.) Defendants move for

summary judgment as to each claim asserted against them by Plaintiff Horter Investment

Management, LLC ("Horter") in its Second Amended Complaint.[1] (Doc. 43.) For the reasons

that follow, Cutter's Motion will be GRANTED IN PART and DENIED IN PART, and

Borer/PCM's Motion will be DENIED.

## I.    BACKGROUND

Broadly, this action concerns the enforceability and interpretation of noncompetition and

nonsolicitation provisions in a contract between Horter and Defendant Cutter. The contextual

facts relevant to this contract and its aftermath are set forth below.

---

[1] Cutter seeks judgment in his favor on "all counts." (Def.'s Mot. Summ. J. at PageID 1076, Doc. 71.) As the
Second Amended Complaint specifies, however, Count III for tortious interference with contract is asserted only as
to Borer/PCM. (Second Am. Compl. at PageID 384, Doc. 43.)

## A. Facts[2]

### 1. Horter's business

Horter is a registered investment advisory ("RIA") firm located in Cincinnati, Ohio that is licensed with the Securities and Exchange Commission. Investment advisor representatives ("IARs") have the option to operate under their own RIA or to contract with an RIA such as Horter. The benefit of the latter is assistance with overhead, including licensing, compliance, fund managers and custodians, and administrative support. In practice, individual investment clients contract with IARs, who then provide investment offerings through their IAR's RIA. The RIA charges a fee for services to the individual investment clients (the "Gross Client Revenue")—a portion of which goes to the IAR according to the contract between the RIA and IAR. IARs in this scenario are independent contractors.

Because IARs secure and maintain individual investment client relationships, an RIA's profitability is tied to its roster of IARs. To attract more IARs, RIAs frequently partner with field marketing organizations ("FMOs") that, like RIAs relative to investment products, assist those who are selling insurance products (*e.g.*, annuities and life insurance). Many IARs also are licensed to sell insurance products; by partnering with an FMO, an RIA gains access to the FMO's IAR pool for recruitment. In this case, Horter had partnered with an FMO called 3-Mentors. If a 3-Mentors IAR registered his investor license with Horter, 3-Mentors was entitled to a referral fee. This partnership was not exclusive; 3-Mentors was contractually free to, and did, partner with RIAs other than Horter.

---

[2] To the extent undisputed, and unless otherwise noted, the facts set forth herein are derived from the Second Amended Complaint (Doc. 43), Answers thereto (Docs. 44, 47, and 52), Cutter's "Statement of Undisputed Facts" (Def.'s Mot. Summ. J. at PageID 1044–60, Doc. 71), Borer/PCM's "Undisputed Material Facts" (Def.'s Mot. Summ. J. at PageID 1083–1101, Doc. 72), and both of Plaintiff's "Statement of Facts." (Pl.'s Opp'n Mem. at PageID 2135–58, Doc. 84; Pl.'s Opp'n Mem. at PageID 2827–54, Doc. 85.)

2. **Cutter and Lang join Horter**

Cutter and Pete Lang[3] were IARs who had registered their investor licenses with Horter. Cutter first joined Horter in late 2011, and Lang joined around the same time.[4] Horter required that its IARs sign an independent contractor agreement. Horter's form IAR agreement contains restrictive covenants. In March of 2014, Cutter executed a new IAR Agreement (the "2014 IAR Agreement") that contained provisions unique to Cutter. The portion of the 2014 IAR Agreement that forms the basis of this controversy is the following:

    3. <u>Non-competition.</u> In consideration of this Agreement and fees to be received for the performance of his/her duties hereunder, [Cutter] hereby agrees that, as long as this Agreement remains in full force and effect and for a period of twelve (12) months after the termination of this Agreement, whether by the action of Horter or [Cutter], [Cutter] will not, directly or indirectly, own, have a proprietary interest of any kind in, be employed by, be a partner in, or serve as a consultant to or in any other capacity with any firm, partnership, corporation, business enterprise or individual which is engaged in competition with Horter for the providing of financial planning or investment advise [sic] that is located within sixty (60) miles of Hamilton County, Ohio. [Cutter] further hereby agrees that, during the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] will not directly or indirectly set up his own/or any affiliated Registered Investment Advisor firm, solicit any employee, or contractor of Horter for employment with [Cutter] himself/herself or with any other company or organization with which [Cutter] associates himself/herself. [Cutter] may go to another Registered Investment Advisor firm.

    1)   [Cutter] or any associated entities or persons will not establish a Registered Investment Advisor firm.

    2) [Cutter] or any associated entities or persons will not solicit any employees or contractors/advisors (other than those directly recruited by [Cutter]) of Horter[.]

    3) [Cutter] may go to another Registered Investment Advisor firm but not of

---

[3] Lang had been a Defendant until he was dismissed from this lawsuit by Notation Order entered September 2, 2015. Lang and Horter have settled their claims. (Settlement Agreement and Release, Drew Horter Dep. Ex.19 at PageID 1900–15, Doc. 76.)

[4] None of the briefs or memoranda cite the date that Lang first contracted with Horter, but the exact date is not material. (Def.'s Mot. Summ. J. at PageID 1046, Doc. 71 ("Lang joined [Horter] the same year as Cutter . . . ."); Pl.'s Opp'n Mem. at PageID 2137, Doc. 84 ("Horter had hired [Lang] as an IAR one year [earlier than Cutter] . . . .").)

an associated entity or person.

4) [Cutter] or any associated entities or persons may not recruit any ELITE advisors of Horter that [Cutter] is currently affiliated with.

5) [Cutter] or any entities or persons is also prohibited from using any Horter Training Materials including the Horter websites at any time after Termination.

4. This prohibition against soliciting any Horter employee, Horter advisors (other than those directly recruited under Independent Contractor/Jeffrey Cutter/Cutter Financial Group "Cutter" or affiliated entity direct recruits) , meaning also Independent Contractor/Jeffrey Cutter/Cutter Financial Group[5] "Cutter" cannot recruit any Elite Advisors, contractor (advisor) or money manager is absolute, regardless of the type of business or employment or whether or not it is in competition, direct or indirect, with Horter . . . .

(Pl.'s Second Am. Compl., Ex. A, ¶¶ 3, 4 at PageID 390–91, Doc. 43-1.)  The numbered paragraphs 1–5 set out by parentheses and the final paragraph (4.) are the provisions unique to Cutter's 2014 IAR Agreement.

The parties do not agree on the precise reason that these provisions were incorporated into the 2014 IAR Agreement, but they do not dispute the following with respect to Cutter's position among other IARs.  First, in 2012, Cutter created a marketing company called Radical Promoting ("Radical") with a partner, Leibel Sternbach, which was designed to streamline marketing and branding for investment professionals.  Horter knew that Radical worked with certain of Horter's IARs, but there was no contract between Radical and Horter governing Radical's relationship with Horter IARs.  Second, Cutter and Drew Horter, Horter's president and founder, had negotiated additional compensation to Cutter for referring IARs to Horter, though this arrangement was not reduced to a written agreement.[6]  Third, both Cutter and Lang

---

[5] Cutter Financial Group is Cutter's own company, which operated in Massachusetts.  (Def.'s Mot. Summ. J. at PageID 1046, Doc. 71.)

[6] Cutter argues that he was not paid for his referrals at all, or in any event, not paid according to their informal agreement.  (Def.'s Mot. Summ. J. at PageID 1049–1051, Doc. 71.)  Horter counters that Cutter was fully compensated under their informal agreement.  (Pl.'s Opp'n Mem. at PageID 2142, Doc. 84.)  As discussed *infra*, resolution of this fact does not bear upon the Court's decision regarding the pending Motion.

were considered "ELITE" IARs, a term distinctive to Horter and that refers to its ten most valuable IARs based on assets under management.

### 3. Creation of a new RIA:  PCM

Toward the end of 2014, Cutter actively began pursuing a path out of Horter.  Earlier in 2014, Cutter had met Ryan Borer, who had an ownership interest in an entity called Fusion.  While Fusion already operated an RIA at that time, Cutter was looking for an RIA with a model more focused on its IARs.  Cutter and Borer both admired the "Keller Williams" business model, in which IARs eventually could benefit from ownership/profit sharing with their RIA.  At this time, Lang was also planning to leave Horter, though the parties disagree on what ultimately triggered his departure.[7]

Toward the end of 2014, Borer, Cutter, and Lang communicated about an RIA modeled on the ideas that they had discussed.  In November of 2014, Borer took the formal steps to create PCM.[8]  PCM is a Texas limited liability company with its principal place of business in Texas, while also maintaining an office in Ohio.  PCM contracted with Radical for marketing and technology services.[9]

Lang and Cutter resigned from Horter effective February 2, 2015 and February 4, 2015, respectively, and registered with PCM.

---

[7] *See, e.g.,* App. to Def.'s Mot. Summ. J., Cutter Dep. 189:20–22 at PageID 1344, Doc. 72-1 ("I basically just told Horter that I was going there. [Lang] had already made his decision. [Lang] was already going there."); *contra* Pl.'s Opp'n Mem. at PageID 2143–44, Doc. 84 (describing Horter's argument and evidence regarding Cutter's solicitation of Lang to join PCM).

[8] PCM's formation documents, including the Texas Secretary of State Certification of Formation of a Limited Liability Company, federal EIN number, SEC registration, and LLC Agreement, do not reference Cutter or any entity in which Cutter holds an ownership interest.  (App. to Def.'s Mot. Summ. J., Borer Dep. Ex. 3 at PageID 1383–1402, Doc. 72-1.)  The Court attaches no significance to the word "create" as it pertains to the interpretation of the 2014 IAR Agreement. This concept is vigorously disputed by the parties, as will be discussed *infra*.

[9] The parties do not cite an exact date, but because Radical registered and created PCM's website, the Court infers that it was around November of 2014.  (Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-2, Borer Dep. 104:2–105:22 at PageID 3572–73, Doc. 86 (Borer describing PCM's contract with Radical).)

#### 4. Horter/3-Mentors partnership terminates and twenty-four Horter IARs go to PCM

In early 2015, 3-Mentors entered into a partnership with PCM, similar to that which it had with Horter. Between March 26 and March 27, 2015, 3-Mentors hosted a conference in Atlanta (the "Atlanta Conference"), at which both Cutter, on behalf of Radical, and Borer, on behalf of PCM, made back-to-back presentations. Horter did not attend this conference and ultimately terminated its relationship with 3-Mentors.[10]

Between early February of 2015 and mid-July of 2015, twenty-four Horter IARs left Horter to register with PCM. All but four of these IARs left Horter subsequent to the Atlanta Conference. Of the twenty-four, Horter considered four of them IARs to be "ELITE" as that term is used in Cutter's 2014 IAR Agreement: Scott Moore, Don Cloud, Rick Durkee, and Pete Lang.

### B. Procedural Posture

This civil action originally was filed in the Hamilton County Court of Common Pleas on May 22, 2015. PCM removed the lawsuit to the Southern District of Ohio on July 20, 2015.

Cutter and Borer/PCM have moved for summary judgment as to each claim asserted against them in Horter's Second Amended Complaint. Against Cutter, Horter alleges breach of contract, breach of fiduciary duty, and tortious interference with business relations. Against Borer/PCM, Horter alleges tortious interference with contract and tortious interference with business relations. Horter seeks injunctive relief against all Defendants. The Motions are ripe for adjudication.

---

[10] Horter argues that 3-Mentors "disinvited" Horter from attending the Atlanta Conference. (Pl.'s Opp'n Mem. at PageID 2155, Doc. 84.) Horter does not appear to dispute, however, that it was Drew Horter that formally terminated the partnership between it and 3-Mentors. (Confidential App. to Def.'s Mot. Summ. J., Drew Horter Dep. 203:12–19 (May 24, 2016) at PageID 1971, Doc. 78.)

## II.     STANDARD OF LAW

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled.  First, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see LaPointe v. United Autoworkers Loc. 600*, 8 F.3d 376, 378 (6th Cir. 1993).  This burden may be satisfied, however, by the movant "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial.  *Celotex*, 477 U.S. at 331–32.  As "the requirement [of the Rule] is that there be no *genuine* issue of *material* fact," the Supreme Court has made clear that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).  Ancillary factual disputes, those "that are irrelevant or unnecessary[,] will not be counted." *Id.*  Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.  Instead, the opposing party must

present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339–40 (6th Cir. 1993) (applying *Anderson*, 477 U.S. at 249–50; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

At this summary judgment stage, it is not the Court's role "to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In so doing, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962))). Adherence to this standard, however, does not permit the Court to assess the credibility of witnesses. *See Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir. 1994) (citing *Anderson*, 477 U.S. at 255)).

## III.    ANALYSIS

The central issue in this controversy is whether the restrictive covenants in Cutter's 2014 IAR Agreement are enforceable, as it underpins the breach of contract and tortious interference with contract claims, and is relevant to whether Defendants tortiously interfered with Horter's business relations. Thus, the Court will decide this question before addressing each of the discrete counts of Plaintiff's Second Amended Complaint.

### A.  Enforceability of the 2014 IAR Agreement[11]

To succeed on a breach of contract claim under Ohio law, which the parties agree governs this dispute, Horter must establish (1) the existence of a binding contract or agreement,

---

[11] Although Horter only asserts a claim for breach of contract as to Cutter, Borer/PCM devote a significant portion of their memoranda to contract enforceability issues as related to the tortious interference with contract claim that is asserted against them. Therefore, the following sections address the arguments of all Defendants.

(2) that it performed its contractual obligations, (3) that the other party failed to fulfill its contractual obligations without legal excuse, and (4) that it suffered damages as a result of the breach. *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App. 3d 95, 108, 661 N.E.2d 218, 226 (Ohio Ct. App. 8 Dist. 1995) (citing *Nat'l City Bank v. Erskine & Sons*, 158 Ohio St. 450, 110 N.E.2d 598 (1953)). The parties strenuously dispute the first element as it pertains to the noncompetition and nonsolicitation provisions of the 2014 IAR Agreement (together, the "Restrictive Covenants").

Courts must carefully scrutinize contracts with restrictive covenants. *Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St. 3d 242, 244, 804 N.E.2d 27, 30 (2004) ("Generally, courts look upon noncompetition agreements with some skepticism and have cautiously considered and carefully scrutinized them.") (internal citation omitted). Nevertheless, they are a fact of "modern economic realities" and are not strictly prohibited. *Id.* Under Ohio law, restrictive covenants may be enforced against independent contractors as well as traditional employees. *Americare Healthcare Svcs., Inc. v. Akabuaku*, No. 10AP-777, 2010 WL 4705148, at *7 (Ohio Ct. App. 10 Dist. Nov. 18, 2010). The Court will begin with whether there was consideration for the 2014 IAR Agreement before turning to its substance.

### 1. **Consideration**

Cutter argues that a failure of consideration renders the 2014 IAR Agreement unenforceable. In support of this argument, he characterizes the Ohio Supreme Court's decision in *Lake Land* as directing courts to investigate the adequacy of consideration in contracts with restrictive covenants. (Def.'s Mot. Summ. J. at PageID 1061–62, Doc. 71.) The Court finds that this is a mischaracterization, the *Lake Land* court having in fact stated: "We concur in the view that in cases involving noncompetition agreements, as in other cases, it is still believed to be

good policy to let people make their own bargains and their own valuations." *Lake Land*, 804

N.E.2d at 32–33 (internal quotation omitted). Where, as here, the relationship between the

parties is at-will, "consideration exists to support a noncompetition agreement when, in exchange

for the assent of an at-will employee to a proffered noncompetition agreement, the employer

continues an at-will employment relationship that could legally be terminated without cause." *Id.*

at 32.

Cutter urges that while continued at-will employment may in certain cases constitute

adequate consideration, Horter offered *additional* consideration for the 2014 IAR Agreement—

its promise to pay Cutter referral fees. When Horter did not perform, this resulted in a failure of

consideration. (Def.'s Reply at PageID 4291, Doc. 88.) While acknowledging an informal

agreement between Horter and Cutter about referral fees, Horter disagrees with this premise.

Horter maintains that it required the Restrictive Covenants to protect itself, because Cutter,

through Radical, was developing relationships with its valuable IARs. Therefore, the only

consideration offered, or needed, for this additional protection was a continued at-will

independent contractor relationship. (Pl.'s Opp'n Mem. at PageID 2141, 2160–62, Doc. 84.)

The Court finds that a reasonable juror could conclude that the only consideration for the

2014 IAR Agreement was continued at-will employment.[12] But, to the extent that a trier of fact

_____

[12] It is undisputed that the 2014 IAR agreement does not reference a separate, related oral agreement and that it does contain an integration clause. (*See* Pl.'s Second Am. Compl., Ex. A, ¶ 15 at PageID 393, Doc. 43-1). There is also no dispute that the effort to formalize the referral arrangement with a written addendum was abandoned in November of 2014. (Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex-5, Cutter Dep. Ex. 7 at PageID 3729–30, Doc. 86 (November 19, 2014 email from Cutter to Drew Horter: "The proposed addendum just doesn't work . . . . I hope there are no hard feelings . . . . [I]t just did not work.").) Nevertheless, Cutter cites his deposition testimony in what appears to be a suggestion that he would not have signed the 2014 IAR Agreement absent an addendum related to referral fees. (*See* Def.'s Reply at PageID 4291, Doc. 88; Ginsburg Aff. in Supp. of Def.'s Mot. Summ. J., Ex. C, Cutter Dep. 156:21–158:23 at PageID 1643–45, Doc. 73). Cutter did sign the 2014 IAR Agreement, however, and there is no evidence suggesting that he signed the agreement under duress or similar legal theory.

was to agree that additional consideration *was* in play, material issues of fact—regarding terms and compliance—remain.[13]

### 2. **Reasonableness**

The Ohio Supreme Court has adopted a "reasonableness" standard for restrictive covenants, which is to be determined on a case-by-case basis. *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 25–26, 325 N.E.2d 544, 547 (1975). A party seeking to enforce such a contract must show, by clear and convincing evidence, that the restrictive covenants are "[1] no greater than is required for the protection of the employer, [2] do[] not impose undue hardship on the employee, and [3] [are] not injurious to the public." *FirstEnergy Solutions Corp. v. Flerick*, 521 F.App'x 521, 525–26 (6th Cir. 2013) (citing *Raimonde*, 325 N.E.2d at 544). The determination of reasonableness is a question of law. *Id.* at 526.

Courts are to consider the following factors in assessing reasonableness:

[W]hether the covenant imposes temporal and spatial limitations, whether the employee had contact with customers, whether the employee possesses confidential information or trade secrets, whether the covenant bars only unfair competition, whether the covenant stifles the employee's inherent skill and experience, whether the benefit to the employer is disproportionate to the employee's detriment, whether the covenant destroys the employee's sole means of support, whether the employee's talent was developed during the employment, and whether the forbidden employment is merely incidental to the main employment.

*Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (citing *Raimonde*, 325 N.E.2d at 544).

---

[13] Drew Horter testified that referral fees were paid based on a 10 basis point formula. (Ginsburg Aff. in Supp. of Def.'s Mot. Summ. J., Ex. A Part 1, Drew Horter Dep. 39:10–19 (May 24, 2016) at PageID 1441.) Horter also produced a document purporting to reflect fees paid to Cutter. (Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-27 at PageID 4005–07, Doc. 86.) Cutter, by contrast, states that it is "his understanding that [he has] not been paid on anything." (Ginsburg Aff. in Supp. of Def.'s Mot. Summ. J., Ex. C, Cutter Dep. 304:2–10 at PageID 1657, Doc. 73.)

The Court identifies the following seven Restrictive Covenants in the 2014 IAR

Agreement:

Related to competition:

1. 3. [A]s long as this Agreement remains in full force and effect and for a period of twelve (12) months after the termination of this Agreement . . . [Cutter] will not, directly or indirectly, own, have a proprietary interest of any kind in, be employed by, be a partner in, or serve as a consultant to or in any other capacity with any firm, partnership, corporation, business enterprise or individual which is engaged in competition with Horter for the providing of financial planning or investment advise [sic] that is located within sixty (60) miles of Hamilton County, Ohio.

2. 1) [Cutter] or any associated entities or persons will not establish a Registered Investment Advisory firm.

3. 3) [Cutter] may go to another Registered Investment Advisor firm but not of an associated entity or person.

Related to solicitation:

4. [Cutter] further hereby agrees that, during the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] will not directly or indirectly set up his own /or any affiliated Registered Investment Advisor firm, solicit any employee, or contractor of Horter for employment with [Cutter] himself/herself or with any other company or organization with which [Cutter] associates himself/herself. [Cutter] may go to another Registered Investment Advisor firm.

5. 2) [Cutter] or any associated entities or persons will not solicit any employees or contractors/advisors (other than those directly recruited by [Cutter]) of Horter.

6. 4) [Cutter] or any associated entities or persons may not recruit any ELITE advisors of Horter that [Cutter] is currently affiliated with.

7. 4.  This prohibition against soliciting any Horter employee, Horter advisor (other than those directly recruited under Independent Contractor/Jeffrey Cutter/Cutter Financial Group "Cutter" or affiliated entity direct recruits) , meaning also Independent Contractor/Jeffrey Cutter/Cutter Financial Group "Cutter" cannot recruit any Elite Advisors, contractor (advisor) or money manager is absolute, regardless of the type of business or

employment or whether or not it is in competition, direct or indirect, with Horter . . . .

Defendants underscore the inartful drafting of these provisions, which is apparent to the Court. They are not well-integrated into the form IAR agreement language and, with one exception, not contain explicit temporal or geographic limitations. Notwithstanding such defects, however, courts may and have modified restrictive covenants to reach reasonable results. *First Energy Solutions Corp. v. Flerick*, 521 F.App'x 521, 526 (6th Cir. 2013) (citing *Raimonde*, 325 N.E.2d at 547). *See also MP Totalcare Servs. v. Mattimoe*, 648 F. Supp.2d 956, 965 (N.D. Ohio 2009). And in this regard, the Court declines to construe any ambiguity against Horter. *Volunteer Energy Servs., Inc. v. Option Energy, LLC*, 579 F.App'x 319, 322 (6th Cir. 2014). Horter and Cutter, together, negotiated Cutter's unique Restrictive Covenants. (Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-26 at PageID 3999–4002, Doc. 86 (email exchange between Cutter and Drew Horter's related to their negotiation of the 2014 IAR Agreement); *Id.*, Ex. A-5, Cutter Dep. Ex. 4 at PageID 3717–19 (same).)

The Court will now discuss whether the Restrictive Covenants are reasonable under Ohio law or, alternatively, whether they can be modified consistent with the *Raimonde* standard.[14]

### a. Are the Restrictive Covenants no greater than necessary?

#### i. First Restrictive Covenant:

*[A]s long as this Agreement remains in full force and effect and for a period of twelve (12) months after the termination of this Agreement . . . [Cutter] will not, directly or indirectly, own, have a proprietary interest of any kind in, be employed by, be a partner in, or serve as a consultant to or in any other capacity with any firm, partnership, corporation, business enterprise or individual which is engaged*

---

[14] Cutter emphasizes that a court is not obligated to modify restrictive covenants to render them reasonable. (Def.'s Reply at PageID 4289–4290, Doc. 88.) The Court agrees, but reads nothing in the cases cited that would direct it *not* to exercise such discretion here, where modification would permit the fashioning of a remedy "in accord with their intention at the time of contracting." *Cintas Corp. v. Perry*, 517 F.3d 459 (7th Cir. 2008) (quoting *Raimonde*, 325 N.E.2d at 467).

*in competition with Horter for the providing of financial planning or investment advise [sic] that is located within sixty (60) miles of Hamilton County, Ohio.*

This first Restrictive Covenant contains a clear geographic limitation, within "sixty miles of Hamilton County, Ohio[,]" that removes it from the scope of this controversy. PCM is located in Texas, and therefore this provision cannot reasonably be said to prohibit Cutter's alleged conduct.

### ii. Second Restrictive Covenant: "[Cutter] or any associated entities or persons will not establish a Registered Investment Advisory firm."

This second Restrictive Covenant contains no temporal or geographic locations, rendering it unreasonable on its face. The Court notes, however, that the form portion of the IAR agreement references a twelve-month temporal limitation, which is corroborated by email negotiations between Drew Horter and Cutter also referencing a twelve-month period. (*See id.*, Ex. A-5, Cutter Dep. Ex. 4 at PageID 3717 (March 18, 2014 email from Drew Horter to Cutter: "We agreed that you and your group could go but find other Managers and respect what Horter provides for 12 months.").)

Cutter urges that, because the twelve-month restriction in Lang's contract has not been enforced, a twelve-month period is effectively unreasonable in this case. (Def.'s Reply at PageID 4290, Doc. 88.) There is insufficient evidence of a pattern/practice of Horter's non-enforcement of the twelve-month restriction to make a finding on that basis. Moreover, settlement of the claims between Horter and Lang is relevant to whether Horter would, absent such a settlement, ordinarily enforce this term of the form IAR contract. Finally, to the extent that Cutter argues that Horter's failure to act on the noncompetition provision in other cases invokes "waiver by estoppel," there is no evidence that Horter *misled* Cutter to believe that such a provision would not be enforced. *See Try Hours, Inc. v. Douville*, 985 N.E.2d 955, 962 (Ohio

Ct. App. 6 Dist. 2013) (holding that "waiver by estoppel" requires a showing that the complaining party was misled by the other party). The Court therefore finds a twelve-month restriction reasonable.

The parties also do not dispute that Horter's business is national, and therefore the Court does not find that the nationwide interpretation urged by Horter in its Response is unreasonable.[15] *See id.*, 985 N.E.2d at 966 (nationwide noncompete provision reasonable with respect to a nationwide trucking business).

### iii. Third Restrictive Covenant: "[Cutter] may go to another Registered Investment Advisor firm but not of an associated entity or person."

This third Restrictive Covenant, which prohibits Cutter from going to the RIA of an "associated entity or person," will be read to have the temporal and geographic limitations of the second Restrictive Covenant.

### iv. Fourth Restrictive Covenant:

*[Cutter] further hereby agrees that, during the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] will not directly or indirectly set up his own /or any affiliated Registered Investment Advisor firm, solicit any employee, or contractor of Horter for employment with [Cutter] himself/herself or with any other company or organization with which [Cutter] associates himself/herself. [Cutter] may go to another Registered Investment Advisor firm.*

This fourth Restrictive Covenant is inapplicable to the allegations at bar. This provision expressly deals with solicitation "for employment."[16] The Court can identify no claim by Horter

---

[15] Horter does business in all fifty states, less Wyoming, and in the District of Columbia and U.S. Virgin Islands. Cutter cites *Professional Investigations and Consulting Agency, Incorporated v. Kingsland*, 69 Ohio App.3d 753, 760, 591 N.E.2d 1265 (1990), in support of the proposition that a lack of temporal or geographic limitation is unreasonable. (Def.'s Mot. Summ. J. at PageID 1066, Doc. 71.) *Kingsland* is distinguishable, because the absence of any restriction imposed a far greater burden upon its defendant (a private security guard) as compared with Cutter in this case.

[16] The first portion of this provision, "[Cutter] further hereby agrees that, during the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] will not directly or indirectly set up

that the alleged solicitation or recruitment was "for employment."  Rather, the alleged

solicitations relate to independent contractors and an FMO, neither of which is eligible for

"employment."

### v.  Fifth through Seventh Restrictive Covenants

The Court addresses the remaining Restrictive Covenants, the fifth through the seventh,

together:[17]

> [Cutter] or any associated entities or persons will not solicit any employees
> or contractors/advisors (other than those directly recruited by [Cutter]) of
> Horter.
>
> [Cutter] or any associated entities or persons may not recruit any ELITE
> advisors of Horter that [Cutter] is currently affiliated with.
>
> This prohibition against soliciting any Horter employee, Horter advisor
> (other than those directly recruited under Independent Contractor/Jeffrey
> Cutter/Cutter Financial Group "Cutter" or affiliated entity direct recruits)
> , meaning also Independent Contractor/Jeffrey Cutter/Cutter Financial
> Group "Cutter" cannot recruit any Elite Advisors, contractor (advisor) or
> money manager is absolute, regardless of the type of business or
> employment or whether or not it is in competition, direct or indirect, with
> Horter . . . .

Besides lacking temporal and geographic limitations, these provisions suffer another

defect.  They fail to qualify the purpose for which Cutter and his associated entities are

prohibited from soliciting/recruiting Horter contractors/advisors and ELITE advisors.  In

particular, the Court finds the seventh provision extremely overbroad.  The Court will not

enforce a covenant so broad, and is compelled to limit its applicability to what was envisioned by

the parties as evidenced by the other, unique additions to the 2014 IAR Agreement:

---

his own /or any affiliated Registered Investment Advisor firm[,]" appears consistent with the intention of the parties
and will be combined with the similar, second Restrictive Covenant addressed *supra*.

[17] Borer/PCM misstate the terms of the fifth Restrictive Covenant.  The contract states "employees or" and not
"employees of[,]" as indicated by Borer/PCM.  (Def.'s Reply at PageID 4404, Doc. 89.)  To the extent Horter's
allegations are limited to solicitation of its contractors/advisors, the Court does not address Defendants' arguments
regarding the solicitation of Horter's employees.

soliciting/recruiting IARs/3-Mentors to register or partner with an RIA that was "established" or "directly or indirectly set up" by Cutter. *See Avery Dennison Corp. v. Kitsonas*, 118 F. Supp.2d 848, 854 (S.D. Ohio 2000) (modifying the scope of the restrictive covenant to prohibit employment with only those companies that sold products "substantially similar" to, or "competitive" with, the prior employer); *Mattimoe*, 648 F. Supp.2d at 964 (N.D. Ohio 2009) (reforming a contract's non-compete to limit it to the "wound care" field). Without the language purporting to impose an "absolute" prohibition against recruitment for any purpose, the seventh Restrictive Covenant effectively restates the fifth and sixth. Accordingly, the Court will not give the seventh Restrictive Covenant any effect.

In view of the above discussion, the Court finds that only the Restrictive Covenants, as modified below, will be evaluated under the standards set forth in *Raimonde* and *Basicomputer*,:

    **a.** During the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] or any associated entities or persons will not establish a Registered Investment Advisory firm, and will not directly or indirectly set up his own/or any affiliated Registered Investment Advisor firm, in any of the forty-nine United States (except Wyoming), the District of Columbia, or the U.S. Virgin Islands.[18]

    **b.** During the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] may go to another Registered Investment Advisor firm but not of an associated entity or person in any of the forty-nine United States (except Wyoming), the District of Columbia, or the U.S. Virgin Islands.

    **c.** During the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] or any associated entities or persons will not solicit any contractors/advisors (other than those directly recruited by [Cutter]) of Horter in any of the forty-nine United States (except Wyoming), the District of Columbia, or the U.S. Virgin Islands to register or partner with an RIA established, or directly or indirectly set up, by Cutter.

    **d.** During the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] or any associated entities or persons may

---

[18] This modified Restrictive Covenant combines the second and fourth Restrictive Covenants to the extent that the Court finds only the first portion of the latter enforceable. (*See supra* note 16.)

not recruit any ELITE advisors of Horter that [Cutter] is currently affiliated with in any of the forty-nine United States (except Wyoming), the District of Columbia, or the U.S. Virgin Islands to register or partner with an RIA established, or directly or indirectly set up, by Cutter.

### b. Do the Restrictive Covenants protect legitimate interests?

Where a restrictive covenant imposes unreasonable restrictions, it "will be enforced to the extent necessary to protect the employer's legitimate interests." *Raimonde*, 325 N.E.2d at 547. Therefore, before applying the modified Restrictive Covenants to the balance of the reasonableness factors, the Court considers whether Horter has demonstrated that it sought to protect legitimate business interests.

Borer/PCM state in their Motion that "Ohio Courts have recognized *only two* legitimate business interests that are sufficient to support enforcement of a noncompetition agreement," and that those interests are "preventing the disclosure of the former employer's trade secrets or the use of the former employer's proprietary customer information to solicit the former employer's customers." (Def.'s Mot. Summ. J. at PageID 1104, Doc. 72 (citing *Brentlinger Ents. v. Curran*, 141 Ohio App.3d 640, 752 N.E.2d 994 (Ohio Ct. App. 10 Dist. 2001)) (emphasis added).) Not so. Indeed, Borer/PCM's argument demonstrates the danger in trying to formulate black letter law in an area of law that is inherently fact specific—a danger that the Sixth Circuit expressly has cautioned against:[19]

> We have cautioned against interpreting too broadly a fact-bound case evaluating a noncompete covenant. . . .
>
> . . . .
>
> [A]n employer has a legitimate business interest in avoiding unfair competition caused by an employee's misuse of confidential information, but we disagree that this is the **only** legitimate business interest an employer can seek to protect through a noncompete covenant.

---

[19] In *FirstEnergy*, 521 F.App'x at 526, the Sixth Circuit specifically refers to the *Brentlinger* case cited by Borer/PCM in cautioning the defendant therein from proposing an unwarranted and overbroad extension of *Brentlinger's* holding.

*FirstEnergy*, 521 F.App'x at 528 (internal citations omitted) (emphasis added).  In fact, other "legitimate interests" have been recognized by Ohio courts:

> An employer has a legitimate interest in limiting not only a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established client, but also in preventing a former employee from using his former employer's customer lists or contacts to solicit new customers. . . . In addition, an employer has a legitimate interest in preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business, regardless of whether it was an already established customer of the former employer.

*UZ Engineered Prod. Co. v. Midwest Motor Supply Co.*, 147 Ohio App. 3d 382, 396–97, 2001-Ohio-8779, ¶ 39, 770 N.E.2d 1068, 1080 (Ohio App. 10 Dist. 2001) (internal citations omitted); *see also Ak Steel Corp.*, 2014 WL 11881029, at *12 (recognizing legitimate business interests in protecting confidential information and strategies, even those that do not rise to the level of a trade secret, and customer relationships).

Cutter also cites *Brentlinger* in its discussion of whether the Restrictive Covenants protect "legitimate interests."  Focusing on the perceived requirement that Horter show that it was protecting proprietary information, Cutter asserts several reasons why Horter has not made such a showing. First, Cutter argues that the Restrictive Covenants must not be necessary, because Horter would have wanted protection from any of its IARs disclosing proprietary information, but they were only included in Cutter's 2014 IAR Agreement.  The Court disagrees.  As Cutter himself acknowledges, the form IAR contract contained certain restrictive covenants that could have served the purpose of protecting proprietary information.  (*See* Def.'s Mot. Summ. J. at PageID 1046–47, Doc. 71.)  But as discussed (*see supra* pp. 4–5), because of his recruitment efforts vis-à-vis Radical, Cutter was in a different position than other IARs.  Cutter's next argument, that the 2014 IAR Agreement's confidentiality provision negated the need for a separate covenant, is similarly unavailing.  The Court

does not find anything to suggest that this confidentiality provision and the Restrictive Covenants are mutually exclusive.

Cutter advances another argument: the nonsolicitation provisions are "unreasonable restraint[s] against the free movement of independent contractors serv[ing] no legitimate purpose." (*Id.* at PageID 1066–68.) The cases cited for this argument come from outside Ohio and the Sixth Circuit and, in any event, are distinguishable. *Triangle Film Corporation v. Artcraft Pictures*, while containing the attributed quote, "[t]hat nobody in his own business may offer better terms to an employe[e], himself free to leave, is so extraordinary a doctrine, that we do not feel called upon to consider it at large[,]" does not deal with restrictive covenants such as those at issue. *Triangle Film Corp. v. Artcraft Pictures* 250 F. 981, 983 (2d. Cir. 1918). The quotation cited from *LaBriola v. Pullard Group, Incorporated* comes from a concurring opinion—the majority having held that the restrictive covenants were unenforceable due to lack of consideration under Washington law. *LaBriola v. Pullard Group, Inc.*, 152 Wash.2d 828, 110 P.3d 791 (2004). *Schmorahl, Treloar & Company, P.C. v. McHugh* was decided under well-defined Missouri law, which unlike Ohio law, strictly limits enforceability of restrictive covenants to *only* trade secrets and customer contacts. *Schmorahl, Treloar & Company, P.C. v. McHugh* , 28 S.W.3d 345, 349 (Mo. Ct. App. 2000). Further, the *Schmorahl* court did not confront a nonsolicitation clause in conjunction with a noncompetition clause, which could have changed the analysis. *Id.* at 351 ("The law's policy favors free competition *when no agreement provides otherwise*[.]) (emphasis added). In *National Employment Service Corporation v. Olsten Staffing Service, Inc.*, "[plaintiff's] employees were light industrial laborers who were not in a position to appropriate the company's goodwill and were without

access to sensitive information," a fact pattern that is not analogous to the case at bar. *National*

*Employment Service Corporation v. Olsten Staffing Service, Inc.*, 145 N.H. 158, 161 (2000). [20]

Horter has presented evidence of the "legitimate interests" that it sought to protect by the Restrictive Covenants. Cutter was part of Horter's ELITE advisor group. Cutter acknowledges in a November 18, 2014 email to Drew Horter—produced in response to a discovery request and provided in support of his Motion—that he planned to "help on the Elite Advisor platform." (Aff. to Def.'s Mot. Summ. J., Ex. P at PageID 1867, Doc. 73.) This elite group exchanged beneficial marketing and operational ideas. (Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A, Drew Horter Dep. 23: 18–22 (May 24, 2016) at PageID 3530; *id.*, Ex. A-18 at PageID 3940, Doc. 86 (December 18, 2015 email from Lang to several former Horter ELITE advisors: "[T]he formation of our elite group was the genesis for the rapid expansion of each of our businesses.").) Horter sent ELITE advisors to training sessions on an annual basis (*id.*, Ex. A-6, Drew Horter Dep. 29:4–17, June 7, 2016 at PageID 3789) and they were given "special attention" (*id.*, Ex. A-5, Cutter Dep. Ex. 9 at PageID 3737 (December 9, 2014 email from Drew Horter to Cutter: "[I] want to give you and the other ELITE advisors special attention."). In an email received and produced by Lang, Borer implies that discussions among an RIA investment committee's members could include trade secrets. (*Id.*, Lang Dec. Ex. B-3 at PageID 4139.) Horter's ELITE IARs were not necessarily an investment committee, but the concept could be analogous. More generally, Drew Horter testified that Cutter was in the health care industry prior to coming to Horter in 2011, which suggests that Cutter gained most of his IAR/RIA knowledge through his tenure with Horter. (*Id.*, Woods Dec. Ex. A-6, Drew Horter Dep. 23:3–10 (June 7, 2016) at PageID 3786.)

---

[20] Cutter advances a fourth argument as to why the Restrictive Covenants do not protect legitimate interests: Horter expressly *allowed* proprietary client information to be disclosed—given that the Restrictive Covenants do not prohibit Cutter from soliciting his existing and recruited clients upon leaving Horter. The Court agrees and Horter appears to concede this point; but the Court does not believe Horter to argue that it sought to protect against the disclosure of proprietary *client* information by its insistence upon the Restrictive Covenants.

The Court concludes that Horter was attempting to protect its legitimate interest in avoiding unfair competition due to the relationships built and information shared as part of the ELITE advisors group—particularly where Cutter had introduced a further means of tying himself to other ELITE advisors through Radical.  *See UZ Engineered*, 770 N.E.2d at 1080; *Ak Steel*, 2014 WL 11881029, at *12.

### c.  Do the Restrictive Covenants unduly burden Cutter?

Having determined that the modified Restrictive Covenants protect legitimate business interests, the Court addresses the remaining *Raimonde* reasonableness factors. To be enforced, the Restrictive Covenants may impose hardship, but not "undue" hardship, upon Cutter.  *AK Steel Corp. v. ArcelorMittal USA, L.L.C.*, 55 N.E.3d 1152, 1158 (Ohio Ct. App. 12 Dist. 2016).  "Undue" hardship requires a greater showing of impact upon a defendant than simple hardship, and should be determined as of the time the agreement was executed.  *Try Hours*, 985 N.E.2d at 962 (internal citations and quotations omitted).

Other than as related to overbreadth concerns, addressed above, Defendants do not appear to argue that the Restrictive Covenants impose an undue hardship upon Cutter, and the Court finds little in the way of support for such an argument.  Even absent any modification by this Court, the Restrictive Covenants allow Cutter to go to another RIA, provided that it is not the RIA "of an associated entity or person."  (Pl.'s Second Am. Compl., Ex. A, ¶ 3 at PageID 390, Doc. 43.)  He is expressly permitted to take IARs that he recruited to Horter.  (*Id.*)  There is no prohibition related to his individual investment clients.  The Court has the impression that the Restrictive Covenants, as modified, deprive Cutter of virtually *no* opportunities to continue working in his industry in a position largely identical to the position that he had with Horter.  *See Basicomputer*, 973 F.2d at 513 (discussing continued ability to maintain livelihood as weighing against a finding of "undue

hardship"); *AK Steel*, 55 N.E.3d at 1158 (same); *Try Hours*, 985 N.E.2d at 962 (same). This factor weighs in Horter's favor.

### d. Are the Restrictive Covenants injurious to the public?

Defendants do not squarely address this factor, which, at base, concerns the promotion of fair business competition. *UZ Engineered Products Co.*, 770 N.E.2d at 398. It is undisputed that there are a multitude of RIA options nationwide. Individual investment clients in the public have many options available for their investment needs and are not restricted in moving their business from one IAR to another as a result of the Restrictive Covenants. Thus, the Court finds that the Restrictive Covenants are not injurious to the public.

Having reviewed the reasonableness factors set forth in *Raimonde*, the Court concludes that they weigh in favor of enforcing the Restrictive Covenants as modified.

## B. Breach of Contract

The Court now turns to whether Horter has demonstrated genuine issues of material fact as to the remaining breach of contract elements: whether Horter performed its contractual obligations, whether Cutter failed to fulfill his contractual obligations without legal excuse, and whether such failure resulted in damages to Horter. *See Garofalo*, 661 N.E.2d at 226.

### 1. Did Horter perform its contractual obligations?

Cutter's arguments relative to Horter's performance are limited to its payment of referral fees to Cutter, which the Court discussed in Part III(A)(1) *supra*. Even if a promise to pay such fees did represent additional consideration for the 2014 IAR Agreement, there is conflicting testimony about whether the referral fees were paid. (*See supra* note 13.) The Court therefore finds that there is a genuine issue of material fact regarding whether Horter performed its contractual obligations to the extent that any obligations existed beyond it continuing its contractual relationship with Cutter.

2. **Did Cutter fail to fulfill his contractual obligations without legal excuse?**

a. **Noncompetition provisions**

The Court begins with the modified Restrictive Covenants dealing with competition:

a. During the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] or any associated entities or persons will not establish a Registered Investment Advisory firm, and will not directly or indirectly set up his own/or any affiliated Registered Investment Advisor firm, in any of the forty-nine United States (except Wyoming), the District of Columbia, or the U.S. Virgin Islands.

b. During the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] may go to another Registered Investment Advisor firm but not of an associated entity or person in any of the forty-nine United States (except Wyoming), the District of Columbia, or the U.S. Virgin Islands.

It is undisputed that the alleged prohibited conduct took place within twelve months from Cutter's termination and that it took place within the geographical limitation of where Horter competes. This leaves the Court to examine the record for evidence that Cutter "established" an RIA, "directly or indirectly set up his own/or any affiliated" RIA, or went to an RIA of an "associated entity or person."

Cutter and Borer/PCM focus on the fact that Fusion, through Borer, indisputably owns PCM according to its formation documents. (*See supra* note 8.) Cutter characterizes Horter's arguments otherwise as innuendo, mischaracterizations, unsupported assertions, and hearsay. (Def.'s Reply at PageID 4291–93, Doc. 88.) While we agree that Horter may overstate the strength of its evidence, the Court is not to determine the credibility and weight of the evidence at the summary judgment stage. *Anderson*, 477 U.S. at 249. The Court is simply to review the record for evidence demonstrating a genuine issue of material fact. The modified Restrictive Covenants related to noncompetition do not say that Cutter may not "incorporate," "own," "be the president of," *et cetera*. The language is considerably broader.

24

The Court finds that any of the following portions of the record, not purporting to be an exhaustive list, would allow a reasonable juror to conclude that Cutter "established" an RIA or "directly or indirectly set up his own/or any affiliated" RIA:

- In an October 16, 2014 email, Cutter asks Lang to join a call with Fusion (Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-11, Lang Dep. Ex. 15 at PageID 3877, Doc. 86), and Lang testified that this call was about how they could "create" an RIA. (*Id.*, Ex. A-10, Lang Dep. 135:5–18 at PageID 3850.)

- In an October 22, 2014 email, Borer described what would become PCM: "I think we can work with you to make something happen so there is a spread in the contract for **your** new entity." (*Id.*, Lang Dec. Ex. B-9, Horter/Hetzer Dep. Exs. 35–36 at PageID 4176 (emphasis added).)

- In an October 25, 2014 email chain, Borer "look[s] forward to partnering with [Cutter] and [Lang]" and describes PCM as follows: "We also discussed structuring **your** group as a standalone RIA. If this is the direction **you** decide please let us know as soon as possible. . . ." (*Id.*, Woods Dec. Ex. A-3, Borer Dep. Ex. 21 at PageID 3631 (emphasis added)); *Id.*, Ex. A-2, Borer Dep. 193:12-14 at PageID 3599 (Borer testifying that this "standalone RIA" was what became PCM).)

- In a November 13, 2014 email, Cutter writes to Lang: "Pete . . . . I need to talk to you at some point today. We need to finalize **how we want the RIA to be set up** . . . ." (*Id.*, Ex. A-33 at PageID 4107 (emphasis added).)

- Borer testified about how he came to the decision to start PCM as being related to Cutter's input:

    Q: [T]he general picture here is, you were talking with Mr. Cutter, and he was interested in . . . leaving his existing RIA to join a new one, right?

    A: Correct.

    Q: And through your discussions with Mr. Cutter, it became apparent that what he wanted in an RIA wasn't really compatible with what Fusion's retail side was set up to provide?

    A: Parts of it.

    . . . .

    Q: And as a result of that realization, the decision was made to create Precision as a new RIA that would fit Mr. Cutter's desires that you've just described?

A: Yeah. That's what I recommended, yeah.

(*Id.*, Ex. A-2, Borer Dep 58:3–12, 17–21 at PageID 3558.)

Q. [W]e talked about your conversation with Mr. Cutter about potentially joining Fusion and how Fusion really didn't fit the model that he was looking for, and so you made the decision to create Precision that would fit the parameters, that interest that he had in a new RIA, right?

A. Correct.

(*Id.*, 116:12–18 at PageID 3579.)

- Cutter testified that he was to be a part of PCM, including its investment committee:

Q. And as I understand your testimony, you weren't sure which of those entities it was going to be at this point?

A. Yeah, but I think it was around this time that PCM was coming to light that Ryan had made the decision that PCM was going to be formed and **we are going to be part of PCM.** We were -- I'm talking about me, **that I was going to be part of the investment committee appealed to me because now I've got some control over our destiny . . . .**[21]

(App. to Def.'s Mot. Summ. J., Cutter Dep. 217:11–21 at PageID 1345, Doc. 72-1 (emphasis added).)

- In a December 27, 2014 email to, among others, Borer, Lang, and two other Radical employees,[22] Cutter sets out investment portfolio package ideas and discusses how to brand PCM. Specifically, he says:

We need to be 95% ready to launch PCM by February 1st. We only have one chance to make a great impression and once the #1 & #2 guys leave Horter we need to be ready to create that buzz and be ready for the flow of inquiries. . . . The compilation of PCM, Partners and Radical [connect[s] the marketing and branding dots] and in my opinion no one has it from what I have seen. . . . We are building something magical here.

---

[21] When pressed on this point in his deposition, Cutter goes on to deny that he was attracted to registering with PCM due to having some control over its operations. The Court finds, however, that a reasonable juror could conclude that the momentum to create PCM was driven by the fact that Cutter and Lang were going to be a part of its investment committee, among other reasons.

[22] Leibel Sternbach was identified as Radical's chief marketing officer, and Morgan Wendlandt as its director of operations; Sternbach founded Radical with Cutter and Wendlant joined Radical in late 2013 or early 2014. (*Id.*, Ex. A-4, Cutter Dep. 48:3–16, 49:18–50:5 at PageID 3668–70.)

(Confidential App. to Pl.'s Opp'n Mem., Ex. A-3, Borer Dep. Ex. 27 at PageID 3635–36.)

- Radical's business plan, which Lang received by email from Cutter, describes a "strategic partnership/ownership" of PCM. (*Id.*, Lang. Dec. Ex. B-2 at PageID 4130.)

- At the Atlanta Conference, Borer referred several times to Cutter and Lang, and testifies that he may have referred to these two as "a couple of advisors here at the head of the ship driving this[.]" (*Id.*, Woods Dec. Ex A-25, Richardson Dec. at PageID 3995 (transcription of the Atlanta Conference presentation by Borer on behalf of PCM); *Id.*, Ex A-2, Borer Dep. 143:4–144:23 at PageID 3583–34.)

- Marketing material created for PCM by Wendlandt at Radical included a Q & A piece with Cutter and Lang. The first question is: "Why did you leave Horter to Start Precision?" (*Id.*, Ex. A-5, Cutter Dep Ex. 29 at PageID 3770.)[23]

In view of the above, the Court finds that a genuine issue of material fact exists as to whether Cutter breached the noncompetition provisions.[24]

### b. Nonsolicitation provisions

The Court now turns to the modified Restrictive Covenants dealing with solicitation:

**c.** During the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] or any associated entities or persons will not solicit any employees or contractors/advisors (other than those directly recruited by [Cutter]) of Horter in any of the forty-nine United States (except Wyoming), the District of Columbia, or the U.S. Virgin Islands to register or partner with an RIA established, or directly or indirectly set up, by Cutter.

**d.** During the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement, [Cutter] or any associated entities or persons may not recruit any ELITE advisors of Horter that [Cutter] is currently affiliated with in any of the forty-nine United States (except Wyoming), the District of Columbia, or the U.S. Virgin Islands to register or partner with an RIA established, or directly or indirectly set up, by Cutter.

---

[23] When questioned about this exhibit, Cutter says that the creator document was "confused" about the origins of PCM. (*Id.*, Cutter Dep. 279:16–280:7 at PageID 3684–85.) The Court finds that the credibility of Cutter with respect to this testimony would be a question for the trier of fact.

[24] Because a reasonable juror could determine that Cutter "established" or "directly or indirectly set up" PCM within the meaning of the first modified Restrictive Covenant, the Court does not here address the second modified Restrictive Covenant. Similarly, the Court does not find it necessary to address the parties' arguments with respect to an oral promise by Borer to grant Cutter and Lang formal, future ownership of PCM. A genuine issue of material fact exists as to whether the noncompetition provisions were breached without reaching these issues.

These provisions prohibit the solicitation of Horter's contractors/advisors (other than those directly recruited by Cutter) and the recruitment of Horter's ELITE advisors with whom Cutter is affiliated by Cutter or any associated entities or persons.

The Court begins with the definition of the term "solicit" as used in the first Restrictive Covenant dealing with solicitation. As cited by Borer/PCM, Black's Law Dictionary (10th ed. 2014) defines "solicitation" as: "1. The act or an instance of requesting or seeking to obtain something." The Court notes, however, another relevant definition provided therein: "4. An attempt or effort to gain business." *Id.*

The Court next must examine the phrase "associated entities" as used in the 2014 IAR Agreement. The term is not defined and is subject to differing interpretations. The seventh Restrictive Covenant initially identified by the Court (*see supra* pp. 12–13) contains the following phrase, which could shed light on the meaning of the phrase "associated entities":

> [O]ther than those directly recruited under Independent Contractor/Jeffrey Cutter/Cutter Financial Group "Cutter" or affiliated entity direct recruits [], meaning also Independent Contractor/Jeffrey Cutter/Cutter Financial Group "Cutter[.]"

But with the inclusion of the phrase "or affiliated entity direct recruits," an outside reader of the 2014 IAR Agreement remains unclear as to which entities would be subject to its prohibitions. And, regardless, this apparent attempt to define "Cutter" to include at least one other distinct entity ("Cutter Financial Group") is not picked up elsewhere in the Restrictive Covenants and is thus of little interpretive use. The Court therefore finds the language ambiguous as "its meaning cannot be determined from the four corners of the agreement." *Kehoe Component Sales Inc. v. Best Lighting Prod., Inc.*, 933 F. Supp. 2d 974, 995 (S.D. Ohio 2013). In such case, the Court "may consider extrinsic evidence to ascertain the parties' intent," such as "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by

entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave

to their agreement." *Id.* (quotations omitted).

Horter has produced evidence that Cutter's association with Radical played a role in

positioning him to make referrals. (Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-5,

Cutter Dep. Ex. 7 at PageID 3730, Doc. 86 (in a November 18, 2014 email from Cutter to Horter

regarding unexecuted contract addendum on referrals: "The Radical side of my business is booming

which has created 18M in first appointments coming through the doors over the next three and half

weeks.").) In addition, the following is from Drew Horter's deposition testimony when he is

questioned about Radical and referral fees:

> Q. Did Radical train some of the investment advisor representatives that
> contracted with Horter?
>
> A. We invited Mr. Cutter to be part of our elite advisor group, which was an
> entity that those partners in there would exchange marketing and operational
> ideas, and he took it upon himself to introduce Radical.
>
> . . .
>
> Q. [D]o you know if any of your independent contractors had contracts or
> arrangements with Radical?
>
> A. Two of my elite advisors, to my knowledge, did.
>
> . . . .
>
> Q. [Y]ou tell me what's different about this contract as compared to other
> contracts you have with independent contractor.
>
> A. It's different in the fact that Mr. Cutter was recruiting.

(Ginsburg Aff. in Supp. of Def.'s Mot. Summ. J., Ex. A-1 Part 1, Drew Horter Dep. 23:15–24:8;

27:15–19, Doc. 73.). Cutter also testified:

> Q. And that's to say that Horter was encouraging you, allowing you, relying on
> you to present this Radical method to the other advisors with the company --
> associated with the company?

A. No, not just that. He also wanted to build out a whole distribution method. He wanted to use -- **he wanted to use that Radical process to attract new IARs because nobody had it in the industry**, right, so it was a whole different method that blew him away. He would talk about it, talk about [sic] and talk about it.

(Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-4, Cutter Dep. 151:18–152:4 at PageID 3672–73, Doc. 86 (emphasis added).)  Drew Horter also testified that the term "associated entities or persons" could mean virtually anyone that Cutter knew.[25]  While the Court doubts that the parties intended a meaning this expansive, given the overall context, the Court finds that "associated entities or persons" could reasonably be determined to refer—at a minimum—to Cutter Financial and Radical, the two entities that Cutter formed.

As to the second Restrictive Covenant dealing with solicitation, whether Cutter recruited ELITE advisors that he was affiliated with at the time of the contract, the Court begins with the definitions of the word "recruit."  The definition cited by Borer/PCM for "recruitment" appears to have been derived from www.thelawdictionary.org, as "recruitment" is not defined in Black's Law Dictionary (10th ed. 2014) .  (*See* Mot. Summ. J. at PageID 1106, Doc. 72.)  The Court turns instead

---

[25] Drew Horter's testimony is as follows:

> Q. What's your understanding of that phrase associated entities or persons?
>
> A. Anybody that they – that [independent contractor] is related to or has associated with.
>
> Q. So how would you define that? You mean related to, you mean a family member?
>
> A. No.
>
> Q. How would you define the term associated entities or persons?
>
> A. Any associated entity.
>
> Q. So anybody they know?
>
> A. Could be.

(Ginsburg Aff. to Mot. To Strike, Ex. 3 Part 1, Drew Horter Dep. 33:18–34:4 (May 24, 2016), Doc. 70-1.)

to the Oxford English Dictionary (3rd ed. June 2009) and finds the following definition of "recruit" most applicable: "to seek or enlist new members, supporters, or employees."

Next, the Court examines the phrase "currently affiliated with." Because the meaning of this phrase is not immediately apparent from the four corners of the 2014 IAR Agreement, the Court again looks to extrinsic evidence. *See Kehoe*, 933 F. Supp. 2d at 995. Drew Horter discussed what he meant by "affiliated with" in his testimony regarding Cutter's unique Restrictive Covenants:

> Q. And there's a reference in the subparagraph four to elite advisors of Horter that IC is currently affiliated. What's your understanding of that term?
>
> A. The elite advisors I just talked about before, the top ten advisors of which Mr. Cutter became a part of.
>
> Q. And that phrase that IC is currently affiliated with, what does that mean?
>
> A. Is currently affiliated with any of the top ten advisors in the elite advisor group.
>
> Q. In your mind it applied to anybody in the top ten group?
>
> A. That's correct.
>
> Q. Because he was part of that group?
>
> A. Correct.

(Ginsburg Aff. to Mot. To Strike, Ex. 3 Part 1, Drew Horter Dep 34:23–35:14 (May 24, 2016), Doc. 70-1.) Given this, and the fact that Horter knew that certain of its ELITE advisors to be working with Radical (Conf. App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-1, Drew Horter Dep. 23:6–24:13, May 24, 2016 at PageID 3530–31), the Court finds evidence to suggest that Horter and Cutter understood the phrase "ELITE advisors of Horter that [Cutter] is currently affiliated with" to mean the ELITE advisors at the time the parties entered into the 2014 IAR Agreement.

In view of the foregoing, the Court agrees with Horter that there is a fact issue regarding whether ELITE advisor Lang was solicited by Cutter or by "associated entities or persons,"

because he expressly testified that he was solicited by Cutter and Borer.  (*Id.*, Ex. A-10, Lang

Dep. 114:7–116:2 at PageID 3842–44;  *see also id.*, Lang. Dec. Ex. B-26 at PageID 4261

(October 15, 2016 email from Cutter to Lang:  "We need to talk and get u plugged in ASAP. I

have 2 guys I've recruited.").)

There is also evidence that Cutter discussed with Borer that his and Lang's departures

from Horter could serve to generate interest in PCM—potentially an attempt to seek or enlist

new IARs.  Borer testified:

> Q. [I] think this is from Mr. Cutter where he writes, "No worries. I am just so
> early trying to get all the folks to follow us. The less headaches possible, the
> better." Do you have any idea who he's referring to about the folks following him?
>
> A. I don't.
>
> Q. Did you and Mr. Cutter ever discuss whether Horton Investment advisors
> would follow him to Precision once he actually made the move?
>
> A. Not specific reps that I can recall.
>
> Q. How about generally as a concept?
>
> A. I think in general the one email earlier stated it pretty clearly. In any
> organizations, if the Number 1 and 2 people leave, people are going to talk, so we
> knew there would be chatter.

(*Id.*, Woods Dec. Ex. A-2, Borer Dep. 238:11–19 at PageID 3610.)

There is evidence that Cutter identified Scott Moore, an ELITE advisor, as someone

PCM should recruit using the Radical connection.  (*Id.*, Ex. A-5, Cutter Dep. Ex. 14 at Page ID

3741–45.)[26]  In another email from January 15, 2015, copied to Borer and Sternbach, Cutter

---

[26] This document is a December 31, 2014 email from Cutter to Borer, Sternbach, and two representatives from an FMO ("Partners") with whom PCM had pursued a partnership prior to contracting with 3-Mentors.  The email forwards an email that Cutter received from Scott Moore, thanking him for his services through Radical, with the following caption from Cutter:  "[T]his is what it is all about. He is the number one guy at 3-Mentors and the number 3 guy at Horter.  This is one of the reasons that we must pull the three entities together, PCM, Partners, & Radical."  Cutter strenuously objects to the conclusion that this email demonstrates recruitment (Def.'s Reply at PageID 4296–97, Doc. 88), but the Court is required at this stage to construe the evidence in the light most favorable to Horter as Plaintiff.  *Anderson*, 477 U.S. at 255.

reports calls with two "top guys," who were Radical customers.  (*Id.*, Cutter Dep. Ex. 15 at PageID 3748 ("Now we have an opportunity to get [two of the top guys] on both sides.").)  This email could relate to Horter IARs, as the preceding paragraph updates the email's recipients: "[Horter] is beginning to hemorrhage."  (*Id.*)  Cutter goes to great lengths to downplay the email, arguing that Cutter referred not to the marketing and RIA sides (*i.e.*, invoking PCM), but instead to the marketing and insurance sides.  (Def.'s Reply at PageID 4296, Doc. 88.)  But by copying Borer, a reasonable juror could conclude that he was "looping in" PCM, which would be consistent with other documentary evidence in which Cutter refers to a three-pronged business model comprised of Radical, PCM, and an FMO.  (*See, e.g.,* Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-5, Cutter Dep. Ex. 14 at PageID 3741 (December 2014 email from Cutter to, among others, Borer and Sternbach, in which Cutter says:  "This is one of the reasons that we must pull the three entities together, PCM, Partners, & Radical."); *id.* at PageID 3750 (February 28, 2015 email from Cutter to David Gaylor, 3-Mentors partner and Horter IAR:  "We will share in revenue from the three players; 3-Mentors, Radical, and PCM; in essence, everybody wins and we do it together."); *id* at PageID 3755 (March 30, 2015 email from Cutter to April Crews, Horter IAR, in which he references his association with 3-Mentors, and then talks about "creating [an] RIA firm built by advisors . . . for advisors" with "marketing and branding solutions.").)

Furthermore, in a January 25, 2015 email to Lang and Steinbach, produced by Cutter in discovery, Cutter writes with his ideas about Radical's affiliation with "PA"[27] and PCM:  "I believe aiming Radical's efforts towards the highly competitive but productive Advisors (Elite) who currently are with PA's competitors will bring the most potential early on and capture the

---

[27] "PA," or "Partner's Advantage," was an FMO that PCM considered partnering with prior to contracting with 3-Mentors.  (*See* Def.'s Reply at PageID4296, Doc. 88.)

marketing opportunity before others enter with their own 'Radical solution.'" (*Id.*, Ex. A-33 at PageID 4081.) Replying to this email, Lang acknowledges that he and Cutter have "covenants not to compete[,]" (*id.* at PageID 4079), but goes on to say that "[t]here is nothing preventing Radical from telling those guys that we simply can't let them continue with Radical due to the compliance review of Horter."[28]

In an email produced by Cutter to ELITE advisor Rick Durkee on January 15, 2015, Cutter wrote:

> Please keep this confidential as you a [sic] certainly aware of the risks of this getting out. Regardless, we have created a system that has top fund managers and then the ability to be able to brand and market the solutions to your area. It really is quite amazing. If you have time let's get on the horn and talk.

(*Id.* at PageID 4099.) In a February 2015 email exchange produced by Cutter, Cutter tells Lang that he is working on a "well thought out proposal and presentation" to give to Durkee about coming over to Fusion/PCM. (*Id.* at PageID 4088.) In another February 2015 email produced by Cutter, Strenbach corresponds with Cutter about recruitment for PCM generally—giving a juror a reasonable basis to conclude that Radical was involved in solicitation/recruitment: "It's an opportunity to recruit. I don't remember if I told him about PCM, though I probably did since I seem to talk about it in every conversation I have…. Speak to him . . . ." (*Id.* at PageID 4085.)

Lastly, Horter points to the Atlanta Conference as a primary point of solicitation and recruitment. Cutter and Borer made back-to-back presentations at this conference on behalf of Radical and PCM, respectively. (App. to Def.'s Mot. Summ. J., Moore Dep. Ex. A at PageID 1218, Doc. 72-1 (Atlanta Conference agenda).) While the record before the Court does not

---

[28] Cutter argues that Lang testified that this was not a solicitation. (*See* Def.'s Reply at PageID 4299, Doc. 88; Ginsburg Aff. in Supp. of Def.'s Reply, Ex. D, Lang Dep. 226:5-227:2 at PageID 4375-76, Doc. 88.) The Court finds, however, that a reasonable juror could determine that this "threat" falls within the definition of solicitation. Cutter argues elsewhere that Lang's deposition testimony regarding the meaning of solicitation may not be dispositive. (*See* Def.'s Reply at PageID 4299, Doc. 88 (urging the Court to discount Lang's testimony that he was solicited by Defendants).)

include a transcription of Cutter's presentation, Borer's presentation on that date makes several clear references to PCM's relationship with Radical. (*See* Confidential App. to Pl.'s Opp'n Mem., Ex. A-25, Richardson Dec. at PageID 3987–93, 3995–96, Doc. 86 (transcription of Borer's presentation on behalf of PCM at the Atlanta Conference).) Horter also cites text message exchanges between Cutter and Lang leading up to, during, and just following the Atlanta conference about drumming up interest in PCM and the movement of IARs to PCM. (*See, e.g., id.*, Lang Dec. Exs. B-15, B-22–B-24, at PageID 4198–4203, 4217–4222.) The Court finds that the exchanges during and around the time of the Atlanta Conference would allow a reasonable juror to infer that Cutter and Lang were corresponding about their shared involvement with PCM in the time period surrounding the Atlanta Conference, even without looking to the content of each individual text message.[29]

3. **Has Horter presented sufficient evidence of damages caused by Defendant Cutter?**

Horter asserts damages against Cutter for breach of contract in the form of lost profits. The Sixth Circuit has articulated Ohio law on the subject of lost profits as follows:

> [T]o recover lost profits, a plaintiff must demonstrate that they are "the reasonable result of the breach, and that the profits are not remote and speculative." [*Textron Fin. Corp. v. Nationwide Mut. Ins.Co.*, 115 Ohio App.3d 137, 146, 684 N.E.2d 1261, 1266, 1267 (Ohio App. 10 Dist. 1996)]. "The determination of the existence and amount of the lost profits is a question of fact." *Kosier v. DeRosa*, 169 Ohio App.3d 150, 862 N.E.2d 159, 165 (2006). Damages, like all other elements of a breach of contract claim, must be proven by a preponderance of the evidence. *Langfan v. Carlton Gardens Co.*, 183 Ohio App.3d 260, 916 N.E.2d 1079, 1087 (2009).

*Eggert v. Meritain Health, Inc.*, 428 F.App'x. 558, 563, 2011 WL 2609856

(6th Cir. 2011). The Court will address each of the two required showings in turn.

---

[29] Don Cloud, an ELITE advisor and principal at 3-Mentors was also involved in these text message exchanges. He, along with the other IARs in his company, Cloud Financial, Inc., were the only IARs that left Horter to join PCM prior to the Atlanta Conference.

### a. Are the lost profits the reasonable result of the breach?

Horter has provided testimonial evidence that, notwithstanding dissatisfaction with the

services provided by a particular RIA, substantial inertia could prevent frequent movement of

IARs among RIAs. Borer testified on this point:

> Q. And "Easy Transfer Process" is the last heading, and it reads, "Transferring accounts for your clients can be one of the most daunting tasks an advisor faces. The [PCM] advisor platform takes the pain and stress from this transition." Do you see that?
>
> A. I do.
>
> Q. Is that to say that it's not a simple matter to transfer from one IAR to another and thereby transfer your clients' accounts?
>
> A. Yeah, generally speaking that's true.
>
> Q. That's the reason the Fusion institutional division had work, right, because it's a difficult process?
>
> A. That's accurate.
>
> . . . .
>
> Q. Why is it relevant for Partners Advantage that Brookstone was signing IARs up from Horter?
>
> A. Well, if an advisor -- I mean, I think this applies to a lot of things. If someone is making a change, there's enough pain there to make a change for some reason. It's not an easy thing to make a change. So if they're making a change, there's an opportunity.
>
> . . . .
>
> Q. And then he goes on to write, "Any time that here is a major transition, this is always a fear of change for the lack of the unknown." Is that consistent with what we talked about earlier, that it's a difficult decision to make to transfer from one IAR to another?
>
> A. Yes.

(Confidential App. to Pl.'s Opp'n Mem., Ex. A-2, Borer Dep. 174:5–19, 220:16–20, 227:14–20 at PageID 3591, 3603, 3606.)  Similarly, a draft press release emailed from Wendlandt of Radical, which was circulated just after the Cutter and Lang departures from Horter, acknowledges this difficulty:  "The question is buzzing: we all know how excruciatingly difficult it is to transfer clients from one firm to another – what would possibly make these advisors want to switch RIA firms?"  (*Id.*, Lang Dec. Ex. B-5 at PageID 4153.)

Taken together, this suggests that something other than general dissatisfaction with Horter may have led to the timing —at a minimum—of the IARs' departures.  For example, Durkee provides anecdotal support for this tendency to "stay put" in a March 4, 2015 email, produced by Durkee in discovery, just before the Atlanta Conference:  "I feel as though what's in my firms and my clients best interests is to stick with [Horter], but at year end start looking into becoming my own RIA firm . . . ."  (*Id.*, Ex. A-18 at PageID 3934.)  Introducing a new RIA into the mix, particularly one with a focus on IARs (*see supra* p. 5), could certainly have worked against this inertia.

Further, the Court believes that the portions of the record cited above support the inference, for purposes of summary judgment, that there could be more to whether Cutter or any "associated entities" solicited the twenty-four IARs than the blanket denials contained in their depositions and declarations, as cited forcefully by Defendants.  (Def.'s Mot. Summ. J. at PageID 1056–1060, Doc. 71; Def.'s Mot. Summ. J. at PageID 1093–98, Doc. 72.)  Certain of the IARs have declared, for instance, that "[a]t no time did Jeffrey Cutter, Ryan Borer or anyone from [PCM] or Radical Promoting ever contact me to recruit me or encourage me to join Precision . . . ."  (App. to Def.'s Mot. Summ. J., Durkee Dec. at PageID 1125, Doc. 72-1.)  But that same declaration, in Dukee's case, concludes with the following qualification:  "other than

the above-referenced presentation at the [Atlanta Conference]. . . ." (*Id.*) The Court finds that a reasonable juror could conclude that solicitation or recruitment occurred at the Atlanta Conference or otherwise, despite the subjective perspectives of those allegedly solicited/recruited. Plaintiff is not required to provide direct evidence to establish causation; circumstantial evidence, and the reasonable inferences drawn therefrom, may be sufficient to support a finding of causation. *Eggert,* 428 F.App'x at 564.

### b. Are the lost profits remote and speculative?

Borer/PCM[30] rely heavily upon the Sixth Circuit's decision in *Ask Chemicals, LP v. Computer Packages, Incorporated*, 593 F.App'x 506 (6th Cir. 2014) for their argument that Horter's damages are impermissibly remote and speculative. Therein, the defendant let a Japanese patent expire that was important to the plaintiff's manufacturing process, which it had been contractually obligated to maintain. *Id.* at 507–08. The plaintiff alleged that this breach led to lost profits in its Japanese market. *Id.* The defendant successfully moved for summary judgment, as relevant here, by convincing the Court that while the plaintiff may have proven the *existence* of lost profits, it had not provided a reliable method by which to determine the *amount*. *Id.* at 513.

The Court finds that the facts of the *Ask Chemicals* case are distinguishable. First, though the estimate of damages was based on the Japanese market, the plaintiff had no record of sales in Japan—only estimations based on a brief sales period that was ten years old. *Id.* Second, the plaintiff pointed to sales history from European and North American markets, which the Court found unreliable with respect to Japan in the absence of further market research or analysis. *Id.* Without any information on the Japanese market (size, costs, *etc.*), the court found

---

[30] While Cutter devotes little of his memoranda to the issue of damages, Borer/PCM hone in on damages as related to the claims asserted against them. To the extent all of the damages alleged in this action are lost profits, the Court addresses Borer/PCM's arguments here.

that there could be no way to calculate damages with "reasonable certainty." *Id.* (citing *City of Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St. 3d 65, 68, 521 N.E.2d 814, 817 (1988)).

Without weighing the evidence before it, the Court finds that there is testimony and data in the record sufficient for a trier of fact to make a reasonable approximation of damages if it were to assign liability to Defendants. *Eggert,* 428 F.App'x at 566. The court in *Ask Chemicals* specifically reserves the question of "whether lost-profits damages *never* may be proven by comparison to a plaintiff's performance in an existing market[.]" *Id.* at 511 (emphasis in original). This Court reads this reservation to reflect a degree of sensitivity to a concern raised in the concurring opinion: "[p]roof of lost profits poses an inescapably hypothetical question . . . and thus inevitably requires a degree of estimation." *Id.* at 514 (Clay, J.) (concurring).[31]

Horter has presented the testimony of its president, Drew Horter, and Kevin Hezter as Rule 30(b)(6) corporate representatives, both of whom the Court finds it reasonable to infer would have knowledge of market conditions as they relate to their day-to-day business responsibilities. Horter's profit structure can be described as follows: each client is assessed a management fee of between 1.75% to 2.75% of total assets under management ("AUM"), which constitutes Gross Client Revenue. Cutter was paid a contractual percentage of each client's Gross Client Revenue. To the extent that an IAR would discount the management fee for his individual investment clients, the IAR's contractual fee was proportionally reduced. The

---

[31] This Court is also cognizant of "the general legal proposition that a wrongdoer should bear the burden of uncertainty as to damages when the uncertainty is a result of the wrongdoer's own conduct." *See Owner-Operator Independent Drivers Ass'n, Inc. v. Arctic Express, Inc.*, 288 F. Supp. 2d 895 (2003) (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946)). While not open-ended, the Court considers this principle in the analysis of the existence and extent of lost profits. *See also Ask Chemicals*, 593 Fed. App'x at 515–16 (Clay, J.) (concurring) ("[S]ome degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer." *MindGames, Inc. v. W. Publ'g Co. Inc.*, 218 F.3d 652, 658 (7th Cir.2000) (citation and quotation omitted) *quoted in Telxon Corp. v. Smart Media of Del., Inc.*, 2005–Ohio–4931, 2005 WL 2292800 at *44 (Ohio Ct.App.2005). *See also* Restatement (Second) of Contracts § 352, cmt. a ("Doubts are generally resolved against the party in breach.")).

remaining Gross Client Revenue is then further reduced by money manager fees, marketing partner fees (*e.g.*, 3-Mentors), and technology fees.[32]

To calculate its lost profits, Horter looked to the Gross Client Revenue for each individual client of each of the twenty-four IARs that allegedly left Horter due to Cutter's breach during the last full quarter that their IAR was with Horter. The Gross Client Revenues produced by Horter reflect any discount rates recently offered, as they are specific to each individual investment client. To show how these gross figures were used to reach lost profit projections, Horter produced the money manager fee attributed to each client of each IAR and marketing partner payout reports showing the referral fees paid for each IAR. The net quarterly figure is multiplied by four to arrive at a twelve-month net profit loss calculation.[33]

Borer/PCM identify several basic assumptions upon which Horter's alleged damages rest. (Def.'s Mot. Summ. J. at PageID 1118–19, Doc. 72.) For instance, Borer/PCM are right to question the element of Horter's proposed damages calculation that assumes all IARs would have stayed with Horter for one year. This premise, however, suggests a question of fact as opposed to summary judgment for Defendants. Borer/PCM also question whether future fee discounts would have been offered by the breakaway IARs and whether the individual investment clients' AUMs would have changed. These latter inquiries suggest a "reasonable certainty" standard that would make calculation of lost profits virtually impossible under any circumstances. The Court believes that Horter has made a case sufficient to be presented to the

---

[32] This general description of Horter's profit structure does not appear to be disputed. (*See supra* note 2.)

[33] There is little dispute about this basic damages calculation methodology. (*See* Def.'s Mot. Summ. J. at PageID 1117, Doc. 72 (describing, mathematically, how Horter arrived at its damages calculation); Pl.'s Opp'n Mem. at 2875–76, Doc. 85 (same)). To the extent Borer/PCM raise a question about the inclusion of IAR fee discounts in Horter's calculations (Def.'s Mot. Summ. J. at PageID 1118), the Court finds that Horter clarified that the quarterly figure would incorporate any IAR's existing unique fee discount. (Pl.'s Opp'n Mem. at PageID 2876, Doc. 85.) The parties' disagreement, therefore, primarily concerns certain of Horter's assumptions underlying the calculation.

trier of fact for evaluation of the evidence and determination regarding lost profits, while

allowing for an inescapable element of estimation.

In conclusion, the Court finds that Horter has met its burden of production of evidence

that Cutter breached the modified Restrictive Covenants and will deny summary judgment on

Count I of Horter's Second Amended Complaint.

### C. Breach of Fiduciary Duty

The elements of a fiduciary duty claim under Ohio law are the following: "(1) the

existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3)

an injury resulting proximately therefrom." *Wells Fargo Bank, N.A. v. Sessley*, 188 Ohio App.3d

213, 230, 2010-Ohio-2902, ¶ 36, 935 N.E.2d 70, 83 (Ohio Ct. App. 10 Dist. 2010) (internal

quotation omitted). The Supreme Court of Ohio elaborates:

> We have defined the term "fiduciary relationship" as one "in which special
> confidence and trust is reposed in the integrity and fidelity of another and there is
> a resulting position of superiority or influence, acquired by virtue of this special
> trust." *In re Termination of Emp. of Pratt*, 40 Ohio St.2d 107, 115, 321 N.E.2d
> 603 (1974). In determining whether a fiduciary relationship has been created**, the
> main question is whether a party agreed to act primarily for the benefit of
> another in matters connected with its undertaking**. *Strock v. Pressnell*, 38
> Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988).

*Hope Acad. Broadway Campus v. White Hat Mgt., L.L.C.*, 145 Ohio St. 3d 29, 40–41, 2015-

Ohio-3716, ¶ 43, 46 N.E.3d 665, 676 (2015) (internal quotation omitted) (emphasis added).

With the independent contractor/employer relationship in particular, Ohio law generally requires

that "both parties understand that that relationship is one of special trust and confidence[,]" such

that it cannot be unilateral. *Ne. Ohio Coll. of Massotherapy v. Burek*, 144 Ohio App.3d 196,

204, 2001-Ohio-3293, 759 N.E.2d 869, 875 (Ohio Ct. App. 7 Dist. 2001) (internal quotations and

citations omitted).

Horter argues that the fiduciary relationship with Cutter arose in the context of it "permitting Cutter to develop and nurture relationships with [Horter's] Elite advisors and other IARs by using Radical as their marketing platform" and "bringing in new IARs to associate with [Horter.]" (Pl.'s Opp'n Mem. at PageID 2179, Doc. 84.) In support of this contention, Horter relies upon Drew Horter's testimony: "We invited Mr. Cutter to be part of our elite advisor group, which was an entity that those partners in there would exchange marketing and operational ideas, and he took it upon himself to introduce Radical." (Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-1, Drew Horter Dep. 23:18-22 (May 24, 2016) at PageID3530, Doc. 86.) Horter also cites to the portion of Drew Horter's deposition where he identifies ELITE advisors Don Cloud and Scott Moore as working with Radical. (*Id.*, 24:9-10 at PageID 3531.) Then, Horter cites Cutter's testimony related to an email chain (*id.*, Ex. A-5, Cutter Dep. Ex. 4 at PageID 3717–18), in which Cutter and Drew Horter negotiate Cutter's 2014 IAR contact terms:

> Q. The next sentence goes on, I value you because of your integrity, honesty to me and the trust you have put in me to represent Horter the right way, do you see that?
>
> A. I do.
>
> Q. What was the trust that they had put in you?
>
> A. To start building out the Radical process, FAR holder, FAR methods, FAR advisors and potential advisors.
>
> Q. And that's to say that Horter was encouraging you, allowing you, relying on you to present this Radical method to the other advisors with the company -- associated with the company?
>
> A. No, not just that. He also wanted to build out a whole distribution method. He wanted to use -- he wanted to use that Radical process to attract new IARs because nobody had it in the industry, right, so it was a whole different method that blew him away. He would talk about it, talk about [sic] and talk about it.
>
> Q. You understood that he was placing his trust in you in that respect?

A. Trust as far as what?

Q. The trust you had put in me to represent Horter in the right way, the words on there. You understood he was placing his trust in you?

A. The way I understand it, the trust was to build out the Radical process the right away. That's the trust.

Q. Right. So you understood he was placing his trust in you to do that, what you just described, to build out the Radical process in the right way?

A. Yes.

(*Id.*, Ex. A-4, Cutter Dep. 151:8–152:19 at PageID 3672–73.)

The Court agrees with Cutter that there can be a claim for a fiduciary duty "independent of contractual provisions[.]" *Academic Imaging, LLC v. Soterion Corp.*, 352 F.App'x 59, 69 (6th Cir. 2009) (internal citations omitted). The Court does not find, however, that Horter has demonstrated facts such that a reasonable juror could determine that a fiduciary relationship existed between Cutter and Horter under Ohio law.

Cases cited on this topic frequently frame the issue in terms of whether an employee demonstrated the required reciprocation of the special trust and confidence bestowed by an employer. By contrast, the Court finds particularly lacking here any demonstration of special trust and confidence bestowed by the employer in the first place. Horter did not have a contract with Radical regarding its interaction with Horter IARs (Confidential App. to Pl.'s Opp'n Mem., Ex. A-1, Drew Horter Dep. 23:12–14 (May 24, 2016) at PageID 3530) and even acknowledged that Cutter "took it upon himself" to introduce Radical to ELITE IARs. (*Id.*, Drew Horter Dep. 23:18-22 at PageID 3530.) The Court does not find that the testimony cited could cause a reasonable juror to infer that Horter trusted Cutter as a fiduciary in lieu of this formality.

But even if this Court were to find that Horter considered Cutter a fiduciary, Horter's argument lacks a critical component. There is simply no evidence to demonstrate that Cutter

agreed "to act primarily for the benefit of another in matters connected with [his] undertaking." *See Hope Acad.*, 46 N.E.3d at 676. Radical was an independent business with no contractual relationship to Horter, through which Cutter grew a marketing/promoting client base intended primarily for his own benefit. The Court cannot rule in Horter's favor on the "mere possibility of a factual dispute . . . ." *Mitchell v. Toledo Hosp.* 964 F.2d 577, 582 (6th Cir. 1992) (internal quotation omitted). As a result, the Court will grant summary judgment as to Count II of Horter's Second Amended Complaint.[34]

### D. Tortious Interference with Contract and with Business Relations

Horter asserts the closely related torts of tortious interference with contract and tortious interference with business relations against Defendants. Count III of Horter's Second Amended Complaint states a claim against Borer/PCM for tortious interference with Cutter's 2014 IAR Agreement to the extent that such interference contributed to Cutter establishing or directly/indirectly setting up PCM and soliciting or recruiting Horter's IARs in breach of that agreement. Count IV of same states a claim against all Defendants for tortious interference with Horter's business relationships with the twenty-four IARs that moved to PCM and with 3-Mentors.[35]

Ohio has adopted tortious interference with contract from Section § 766 of the Restatement (Second) of Torts (1979), which is comprised of the following elements: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting

---

[34] Given this holding, the Court will not address Cutter's argument that any alleged violation of a fiduciary duty would have been excused by his right to prepare for future competition under Ohio law. (Def.'s Mot. Summ. J. at PageID 1072, Doc. 71.)

[35] The interference is alleged generally, though the specific relations discussed by the parties are those with the twenty-four IARs and with 3-Mentors. The Court agrees with Borer/PCM that Count IV should be accordingly limited. (*See* Def.'s Mot. Summ. J. at PageID 1115, Doc. 72.)

damages." *Fred Siegel Co. L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 176, 1999-Ohio-260, 707 N.E.2d 853, 858 (1999). The elements of the distinct, but closely related tortious interference with business relations are: "1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 1039 (Ohio Ct. App. 12 Dist. 2015). The primary distinction between the two torts is that with the latter, the interference relates to prospective contractual relationships that may not yet be formalized. *Id.* at 1040.

The Court will begin with the tortious interference with contract claim asserted against Borer/PCM.

### 1. Tortious interference with contract

The Court has concluded that an enforceable contract exists between Horter and Cutter (*see supra* Part III(A)), which is determinative of element one, and therefore moves to the remaining elements. The second element is that Borer/PCM had knowledge of the 2014 IAR Agreement. For this, Horter cites Borer's deposition for his knowledge (1) that IARs are typically subject to restrictive covenants and (2) of the particular restrictive covenants at issue:

> Q. [P]rior to Precision bringing Mr. Cutter on as an IAR, were you aware that he had a contract with Horter Investment Management?
>
> A. Yes.
>
> Q. When did you learn that fact?
>
> A. I don't recall the exact date.
>
> Q. Was it before Precision was created?
>
> A. I don't recall exactly.
>
> Q. In what context did you learn of it?

A. I guess I kind of assumed he did. I mean, every IAR agreement that I know of generally has that, but I think in one conversation where -- I vaguely remember in a conversation we had when he kind of committed that he did have a noncompete. And that's -- I don't think it was ever like discussed in detail or anything like that.

Q. When you say he committed, when was that?

A. I don't remember the exact date, but it was in the fourth quarter at some point.

(Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-2, Borer Dep 127:8–128:1 at PageID 3580–81, Doc. 86.) Horter also argues that Borer had received a copy of Lang's IAR agreement on January 21, 2015 that, while not identical to Cutter's, also contained restrictive covenants. (*Id.*, Ex. A-3, Borer Dep. Ex. 36 at PageID 3648 (Lang's IAR Agreement)).[36] The Court finds that, taken together, this evidence presents an issue of material fact as to whether Borer/PCM had knowledge of Cutter's 2014 IAR Agreement for purposes of this cause of action.[37]

The third element, the wrongdoer's intentional procurement of the contract's breach, requires that a plaintiff either: "(1) prove that the defendant acted with the purpose or desire to interfere with the performance of the contract or (2) prove that the defendant knew that interference was certain or substantially certain to occur as a result of its actions." *Ginn*, 30 N.E.3d at 1041. Horter argues that Borer's knowledge of the contract made Horter certain or substantially certain that the creation of PCM with Cutter's input and participation would breach Cutter's 2014 IAR Agreement. (*See supra* pp. 25–27, 31–35 (containing the Court's discussion

---

[36] Lang's IAR Agreement, at paragraph 3, echoes certain prohibitions contained in Cutter's 2014 IAR Agreement (*e.g.*, "Independent Contractor will not . . . participate in or assist with the formation or operation of any business intended to compete with Horter. . . . Independent Contractor . . . shall not solicit any other Horter client for any purpose.").

[37] The Court does believe that this element requires evidence of direct knowledge of the contract at issue. *Crown Equip. Corp. v. Toyota Material Handling, U.S.A., Inc.*, 202 F.App'x 108, 111 (6th Cir. 2006) ("We assume that the knowledge prong under this formulation requires only knowledge of the contractual relationship sufficient to put the defendant on notice that its actions could interfere with an existing contract.").

of activities that could be determined to have breached the 2014 IAR agreement involving

Borer/PCM).) Testimony from Lang even goes so far as to suggest that Borer anticipated the

present litigation as a result of their activities:

> Q. [T]here was never any agreement to be an RIA. Is that true?
>
> . . . .
>
> A. That's correct. There was never any agreement to be an RIA. There was an agreement that Ryan, as an expert, would hold that RIA in trust for us and turn it over when we were ready.
>
> Q. And yet there's no written trust agreement to that effect, is that accurate?
>
> A. It was oral, and it was confidential. So if there was a written agreement, it wouldn't be confidential. We were very concerned at the time based on the expert testimony or the expert advice given by Ryan Borer that Horter may attempt to enjoin our transfer from our custodian and that we might never get our assets. So we thought it was advisable to stay very quiet. I would like to say at the time, we had no indication that we were going to [3-]Mentors. We were focused on creating relationships with West Coast companies. Therefore, we had no idea this litigation was going to be as extensive as it currently is.

(Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-10, Lang Dep. 217:14, 22–25;

218:1–15 at PageID 3862-63, Doc. 86.)

This testimony from Lang, taken in a light most favorable to Horter, suggests that

Borer/PCM knew about the Restrictive Covenants and intended to structure the new RIA in such

a way as to avoid triggering their noncompetition prohibitions. If an alleged wrongdoer knows

of the contract, he "'is subject to liability even though he is mistaken as to [the facts'] legal

significance and believes that the agreement is not legally binding or has a different legal effect

from what it is judicially held to have.'" *Ginn*, 30 N.E.3d at 1041 (quoting Restatement (Second)

of Torts § 766 (1979)).

Horter has presented evidence that Borer indirectly referenced Cutter's leadership role at

PCM (*see, e.g.,* Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex A-25, Richardson Dec.

at PageID 3986–97, Doc. 86 (transcription of Borer's presentation on behalf of PCM at the Atlanta Conference)) and relied directly upon his ties to Cutter's associated entity, Radical, when selling potential IARs on PCM. (*See, e.g., id.*, Ex A-18 at PageID 3937 (March 30, 2015 email produced by Durkee from Borer: "I wanted to follow up to schedule a time to talk with you further about PCM, Radical . . . ."); *id.*, Ex. A-2, Borer Dep 88:10–11 at PageID 3568 (Borer describing the business arrangement between Radical, PCM, and 3-Mentors: "There's an informal agreement that we would -- we could all help each other's businesses."); *id.*, Ex. A-5, Cutter Dep. Ex. 21 at PageID 3750 (February 28, 2015 email from Cutter to 3-Mentors representatives, copied to Borer: "I really think you will see the value that [PCM brings] to the table is amazing, especially when it ties into the Radical system."). ) This evidence suggests that Borer/PCM's actions contributed to Cutter's alleged breach of modified Restrictive Covenants.

The fourth element, lack of justification, embodies the central aspect of this tort: the interference must be improper to be actionable. *Fred Siegel*, 707 N.E.2d at 858. To identify improper interference, the Ohio Supreme Court adopted the following test from Section § 767 of the Restatement (Second) of Torts (1979):

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Fred Siegel*, 707 N.E.2d at 860. Considered against the menu of factors set out in the Restatement, certain facts weigh against Horter: Borer/PCM certainly had an independent profit motive and had no contractual relationship with Horter. Further, notwithstanding the numerous other RIA options available to the public, increased choice among RIAs would not harm the public.

48

But the Court also finds that some of the evidence discussed with respect to the formation of PCM suggests a noteworthy relationship between Borer and Cutter, which was closely tied to the actions that allegedly breached the Restrictive Covenants. (*See supra* pp. 25–27, 31–35.) In addition, there is evidence that possibly confidential/proprietary information of Horter was forwarded to Borer by Cutter, prior to Cutter's separation from Horter.[38] The Court finds that the above presents a material issue regarding motive that should be reserved for the trier of fact.

Borer/PCM also allude to the affirmative defense of "fair competition" (*see* Def.'s Mot. Summ. J. at PageID 1110, Doc. 72), though deal with it more explicitly as it relates to the tortious interference with business relations claim. The Ohio Supreme Court has adopted this defense from § 768 of the Restatement (Second) of Torts (1979) in connection with tortious interference with contract, and it is available where an "at-will" contract is at issue.[39] *Fred Siegel*, 707 N.E.2d at 860. The elements of this affirmative defense are as follows: "(a) the relation between the actor [] and his or her competitor []concerns a matter involved in the competition between the actor and the other, and (b) the actor does not employ wrongful means, and (c) his action does not create or continue an unlawful restraint of trade, and (d) his purpose is at least in part to advance his interest in competing with the other." *Id.* at 861. Chief among

---

[38] *See* Confidential App. to Pl.'s Opp'n Mem., Lang Dec. Ex. B-8 at PageID 4174, Doc. 86 (October 29, 2014 email from Borer to Cutter and Lang: "I believe we have most of the Horter strategies covered [in attached spreadsheet]."); *Id.* Lang. Dec. Ex. B-6 at PageID 4174 (October 30, 2014 email from Borer to Lang and Cutter: "You may be currently limited in strategies given the way [Horter] has structured his relationship with Jefferson National."); *Id.*,Woods Dec. Ex. A-3, Borer Dep. Ex. 37 at PageID 3653–56 (January 25, 2015 email exchange in which Cutter forwards Borer an email that he received from Drew Horter, which had been addressed to ELITE Horter advisors, asking whether the entity that would become PCM would be able to offer the service described therein).

[39] Horter argues that the "fair competition" defense is not available to Defendants, because although the IAR/RIA relationship is generally "at-will," the Restrictive Covenants, specifically, are not "at-will" terms and therefore not subject to the defense. (Pl.'s Opp'n Mem. at PageID 2867, Doc. 85 (quoting *Ginn*, 30 N.E.3d at 1046).) Because the Court finds, *infra*, that there is a genuine issue of material fact as to one element of the defense, the Court need not decide here whether the affirmative defense is necessarily applicable to this cause of action.

these considerations is the nature of the actor's conduct.  *See Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 742 (6th Cir. 1999).

The Court does not see any argument advanced by Horter as to elements (a), (c), or (d); but (b), whether Borer/PCM employed wrongful means, remains open to a trier of fact's determination.  (*See supra* note 39.)  As it relates to either tort, the Court declines to grant summary judgment as a matter of law for Borer/PCM on the basis of this affirmative defense.

Finally, as to damages, it is not beyond plausibility that a trier of fact could find that Borer/PCM's  use of Cutter and Radical to start and market PCM—allegedly in contravention of the Restrictive Covenants—led the twenty-four Horter IARs to leave and move to Precision. For the reasons discussed in Part III(B)(3) *supra*, the Court finds that the issue of damages is appropriate for consideration by the trier of fact.

### 2.  Tortious interference with business relations

As contrasted with its tortious interference with contract claim, Horter's tortious interference with business relations claim deals with its business relationships with each of the twenty-four individual IARs and 3-Mentors.[40]  The Court will assess the allegations against Borer/PCM and Cutter in turn.

---

[40] It does not appear to the Court that Horter has presented sufficient evidence to raise a genuine issue of material fact as to interference with its 3-Mentors partnership.  Horter's contractual relationship with 3-Mentors was undisputedly non-exclusive and Drew Horter testified unequivocally that he formally terminated the relationship. The Court does not find that the evidence presented as to the 3-Mentors relationship, even construed most favorably to Horter, could show that Defendants knew their actions would cause Horter to cancel its contract with 3-Mentors or that Defendants were the proximate cause of the cancelation.  *See also* Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-18 at PageID 3934, Doc. 86 (March 4, 2015 email from David Gaylor, with 3-Mentors, to Durkee*:* "we are not looking to end the relationship [with Horter] and as far as we are concerned all is okay, I'm not sure how he will receive us working with Jeff . . . [T]here are some minor aggravations, but no deal breakers as far as we are concerned.").  Nevertheless, because the Court will conclude, *infra*, that there *is* a genuine issue of material fact as to interference with the twenty-four IAR relationships, summary judgment on this Count is not appropriate.

### a. As to Borer/PCM

Borer/PCM dispute only the third and fourth elements of this claim:  3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom.  For the reasons discussed in Part III(B)(3), *supra*, the Court believes that the issue of damages is appropriate for consideration by the trier of fact.  The Court, therefore, addresses only element three.

Like with its tortious interference with contract claim,[41] Horter is not required to show direct interference, but must at least show that "interference [wa]s certain or substantially certain to occur" as a result of Defendants' actions.  *Kuvedina, LLC v. Cognizant Tech. Solutions*, 946 F. Supp. 2d 749, 757 (S.D. Ohio 2013) (quoting Restatement (Second) of Torts § 766 cmt. j (1979)).

Horter has presented testimony that Borer/PCM knew that Lang and Cutter terminating their relationships with Horter would create momentum for the new entity:  PCM.[42]  Borer/PCM

---

[41] Borer/PCM argue that, to the extent that there were contracts in place between Horter and each of the "business relations" at issue in this Count (*i.e.*, the twenty-four IARs and 3-Mentors), the claim would be more properly asserted as part of Count III.  Yet because the elements of these two torts are substantially similar, the Court does not find that the way in which the claim was pled to be determinative of the Motions before it. *See United States v. Buckingham Coal Co.*, No. 2:11-cv-383, 2013 WL 1818611, at *8 (S.D. Ohio 2013) (holding that intentional interference with contract claims are not limited to requiring an actual breach, but may also lie in conduct making performance more difficult).

[42] Borer testified:

> Q. He then says, "We only have one chance to make a great impression, and once the Number 1 and Number 2 guys leave Horter, we need to be ready to create that buzz and be ready for the flow of inquiries." Do you know who the Number 1 and Number 2 guys leaving Horter was?
>
> A. It was [Lang] and [Cutter].
>
> Q. And at least by Pete's email -- excuse me, by [Cutter's] email here, did you understand that Mr. Cutter was suggesting there would be an inflow of inquiries from IARs once he and Pete announced they were leaving Horter?
>
> A. Yeah, I understood that.
>
> . . . .

also knew that securing other successful advisors was likewise important.  (*See* Confidential App. to Pl.'s Opp'n Mem., Lang Dec. Ex. B-18 at PageID 4210, Doc. 86 (March 2, 2015 text message from Cutter to Borer and Lang regarding the fact that Don Cloud, a Horter ELITE advisor, was seriously considering moving to PCM:  "If Cloud moves we'll likely be the catalyst for another 20-30M from others who look to us.").)  A trier of fact could reasonably conclude that Borer/PCM's follow up with potential IAR recruits in the wake of those departures was intended to cause disassociations from Horter and registrations with PCM.  (*See, e.g.,* Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-3, Borer Dep. Ex. 41 at PageID 3664, Doc. 86 (March 27, 2015 email from Borer to April Crews with PCM registration link); *Id.*, Ex. 18 at PageID 3937 (March 30, 2015 email from Borer to Durkee:  "I wanted to follow up to schedule a time to talk with you further about PCM, Radical and address any further questions you may have along with next steps."). )

As with the tortious interference with contract claim, certain of the Restatement § 767 factors used to evaluate whether the interference is actionable cut against Horter's position. Borer/PCM were certainly motivated by competition and promotion of profit, and Horter has not presented evidence otherwise.  In addition, the twenty-four IARs were in at-will relationships with Horter and Borer/PCM's conduct was not necessarily at odds with their interests.  By contrast, however, Borer/PCM were closely tied to alleged conduct that damaged the

---

Q. Did you and Mr. Cutter ever discuss whether Horton Investment advisors would follow him to Precision once he actually made the move?

A. Not specific reps that I can recall.

Q. How about generally as a concept?

A. I think in general the one email earlier stated it pretty clearly. In any organizations, if the Number 1 and 2 people leave, people are going to talk, so we knew there would be chatter.

(Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-2, Borer Dep. 205:1–13, 238:11–19 at PageID 3601, 3610, Doc. 86.)

relationships between Horter and its IARs: the creation of a new RIA in breach of Cutter's 2014 IAR Agreement and solicitation/recruitment of 3-Mentors and its IARs. Further, with respect to the interference with contract claim, there is an issue of fact as to whether—in establishing and initially growing PCM—Borer/PCM knowingly enjoyed an improper advantage by having access to Horter's confidential or proprietary information. (*See supra* p. 49 and note 38.) The Court finds that it would be appropriate for a trier of fact to consider these factors related to improper interference in view of the evidence presented.

Borer/PCM again raise the "fair competition" affirmative defense on this claim. The Court finds that, like with the tortious interference with contract claim, there is a fact issue regarding whether Borer/PCM employed wrongful means. For the reasons discussed as it relates to the tortious interference with contract claim (*see supra* pp. 49–50), the Court declines to grant summary judgment for Borer/PCM as having conclusively presented a "fair competition" defense.[43]

### b.  As to Cutter

Like Borer/PCM, Cutter does not dispute elements one and two of this cause of action, and the Court finds its conclusion as to damages discussed above to be relevant here. (*See supra* Part III(B)(3).) The Court therefore deals here only with element three: whether Cutter intentionally interfered with Horter's relations with the twenty-four IARs or 3-Mentors so as to cause a breach or termination of the relationship.

Much of the evidence that Horter has presented as to Cutter establishing PCM and recruiting/soliciting IARs bears upon the evidentiary threshold for this cause of action. (*See*

---

[43] There is no dispute that the 3-Mentors and twenty-four IAR relationships were "at-will." Therefore, unlike with respect to its tortious interference with contract claim, Horter here argues against the success of the defense as opposed to its applicability.

*supra* Part III(B)(2).)  The anticipation of, and attempt to generate, a "buzz" surrounding Cutter's own departure suggests that his relationship with PCM was intended or was substantially certain to cause other Horter IARs to end their relationships with Horter.  (*See supra* pp. 51–52.)

As to the Restatement § 767 factors relating to improper interference, several weigh in favor of Horter's position.  Horter has at least demonstrated an issue of material fact as to whether Cutter's conduct violated his Restrictive Covenants and whether confidential, proprietary, or otherwise sensitive information was improperly forwarded by Cutter to Borer/PCM prior to Cutter's leaving Horter.  (*See supra* Part III(B)(2) and note 38.)  In addition, Lang testified that Cutter's motive in creating PCM was revenge against Horter related to their informal referral agreement.  (Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-10, Lang Dep. 129:24–130:16; 133:15–19; 129:24–131:2, at PageID 3846–47, 3849, Doc. 86 ("[J]eff was driven by a passion to destroy [Horter] . . . because he was not able to get referral fees there.")[44]

While the Court has determined that his relationship with Horter did not rise to the level of a fiduciary, Cutter was a valuable IAR, who worked with 3-Mentors.  (*Id.*, Cutter Dep. Ex. 14 at PageID 3748 ("I used to be with [3-Mentors] and know these guys very well") and other IARs (through Radical and as an ELITE IAR).  Cutter appears to have been regularly apprised of, or involved with, recruitment/solicitation around the time of the Atlanta Conference.  (*See, e.g., id.*, Lang Dec. Ex. B-15 at PageID 4200 (March 23, 2015 text message from Cutter to Lang: "[ELITE Horter advisor] Scott Moore calling u right now"); *id.* at PageID 4202 (March 27, 2015

---

[44] Cutter attempts to neutralize this testimony by pointing out that Lang also testified that this observation was based solely on his reading of Cutter's deposition.  (*See* Doc. 88 at PageID 4307.)  The Court finds, however, that just prior to the testimony cited by Cutter, Lang seems to reference personal conversations with Cutter about the disagreements with Horter over referrals. (Confidential App. to Pl.'s Opp'n Mem., Woods Dec. Ex. A-11, Lang Dep. 131:8-20 at PageID 3848, Doc. 86.)  The Court believes that a trier of fact could reasonably conclude that the observation about Cutter's motives was based upon Lang's personal knowledge as supplemented by his reading of Cutter's deposition.

text message from Cutter to Lang: "[Horter advisor] April crew coming. April 1st[.]"); *Id.*, Ex. B-18 at PageID 4210 (March 2, 2015 text message from Cutter to Borer and Lang regarding the movement of ELITE Horter IAR Don Cloud).) The Court finds that a trier of fact could find that the weight of the circumstances described above is sufficient to demonstrate improper, intentional interference by Cutter with the twenty-four Horter IARs at issue.[45]

Finally, like with Borer/PCM, the Court finds that the only element of the "fair competition" defense at issue is whether Cutter employed "wrongful means" in his competition. Horter has presented evidence that Cutter disseminated possibly sensitive information about Horter, while still employed by Horter, to PCM. (*See supra* note 38.) There is testimony that Cutter was driven in pursuing the PCM project/relationship by not only profit or growth, but also by a personal vendetta related to referral fees. (*See supra* pp. 54 and note 44.) In view of this, the question of "wrongful means" for purposes of a fair competition affirmative defense will be left to the trier of fact.

### E. Injunctive Relief

Defendants each moved for summary judgment as to the injunctive relief requested by Plaintiff in Count V of its Second Amended Complaint. Because summary judgment will be granted as to only the breach of fiduciary duty claim, leaving three other substantive claims to be adjudicated, Defendants' Motions for Summary Judgment cannot be granted as to Count V.

### IV.    CONCLUSION

Horter has presented evidence demonstrating genuine issues of material fact on all claims except Count II of its Second Amended Complaint. Accordingly, the Court hereby **GRANTS** Defendant Cutter's Motion for Summary Judgment (Doc. 71) as to Count II, but **DENIES** it as to

---

[45] Notes 40, 41 *supra* also apply to the tortious interference with business relations claim asserted against Cutter.

Counts I, IV, and V; and **DENIES** Defendants Borer/PCM's Motion for Summary Judgment

(Doc. 72) as to Counts III, IV, and V.

**IT IS SO ORDERED**.

Dated: June 15, 2017                    S/Susan J. Dlott_____
                                        Judge Susan J. Dlott
                                        United States District Court